# SCHAFFER, A MINOR, BY HIS PARENTS AND NEXT FRIENDS, SCHAFFER ET VIR, ET AL. *v.* WEAST, SUPERINTENDENT, MONTGOMERY COUNTY PUBLIC SCHOOLS, ET AL.

No. 04–698.   Argued October 5, 2005—Decided November 14, 2005

O'CONNOR, J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 62. GINSBURG, J., *post*, p. 63, and BREYER, J., *post*, p. 67, filed dissenting opinions. ROBERTS, C. J., took no part in the consideration or decision of the case.

*William H. Hurd* argued the cause for petitioners. With him on the briefs were *Siran S. Faulders, Michael J. Eig,* and *Haylie M. Iseman.*

*Gregory G. Garre* argued the cause for respondents. With him on the brief were *Maree F. Sneed, Jonathan S. Franklin, Zvi Greismann, Judith S. Bresler, Eric C. Brousaides,* and *Jeffrey A. Krew.*

*David B. Salmons* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Clement, Assistant Attorney General Keisler, Acting Assistant Attorney General Schlozman, Marleigh D. Dover, Stephanie R. Marcus,* and *Kent D. Talbert.**

---

*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Virginia et al. by *Judith Williams Jagdmann,* Attorney General of Virginia, *William E. Thro,* State Solicitor General, *Eric A. Gregory* and *Joel C. Hoppe,* Associate State Solicitors General, and *Maureen Riley Matsen,* Deputy Attorney General, and by the Attorneys General for their

JUSTICE O'CONNOR delivered the opinion of the Court.

The Individuals with Disabilities Education Act (IDEA or Act), 84 Stat. 175, as amended, 20 U. S. C. § 1400 *et seq.* (2000 ed. and Supp. V), is a Spending Clause statute that seeks to ensure that "all children with disabilities have available to them a free appropriate public education," § 1400(d)(1)(A) (2000 ed., Supp. V). Under IDEA, school districts must create an "individualized education program" (IEP) for each disabled child. § 1414(d). If parents believe their child's IEP is inappropriate, they may request an "impartial due process hearing." § 1415(f). The Act is silent, however, as to which party bears the burden of persuasion at such a hearing. We hold that the burden lies, as it typically does, on the party seeking relief.

## I

### A

Congress first passed IDEA as part of the Education of the Handicapped Act in 1970, 84 Stat. 175, and amended it

respective States as follows: *Richard Blumenthal* of Connecticut, *Lisa Madigan* of Illinois, *Phill Kline* of Kansas, *Mike Hatch* of Minnesota, *Brian Sandoval* of Nevada, *Patricia Lynch* of Rhode Island, *Rob McKenna* of Washington, and *Peggy A. Lautenschlager* of Wisconsin; for The ARC of the United States et al. by *Drew S. Days III, Seth M. Galanter,* and *Linda A. Arnsbarger;* for the Council of Parent Attorneys and Advocates et al. by *Ankur J. Goel* and *M. Miller Baker;* and for Various Autism Organizations by *Gregory A. Castanias, Thomas F. Urban II,* and *Beth T. Sigall.*

Briefs of *amici curiae* urging affirmance were filed for the State of Hawaii et al. by *Mark J. Bennett,* Attorney General of Hawaii, and *Girard D. Lau,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *David W. Márquez* of Alaska, *Douglas B. Moylan* of Guam, and *W. A. Drew Edmondson* of Oklahoma; for the Council of the Great City Schools et al. by *Julie Wright Halbert* and *Pamela Harris;* for the National School Boards Association by *Leslie Robert Stellman, Rochelle S. Eisenberg, Lisa Y. Settles, Julie Underwood, Naomi Gittins,* and *Thomas Hutton;* and for the Virginia School Boards Association et al. by *Joseph Thomas Tokarz II* and *Kathleen Shepherd Mehfoud.*

substantially in the Education for All Handicapped Children Act of 1975, 89 Stat. 773. At the time the majority of disabled children in America were "either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out,'" H. R. Rep. No. 94–332, p. 2 (1975). IDEA was intended to reverse this history of neglect. As of 2003, the Act governed the provision of special education services to nearly 7 million children across the country. See Dept. of Education, Office of Special Education Programs, Data Analysis System, http:// www.ideadata.org/tables27th/ar_ aa9.htm (as visited Nov. 9, 2005, and available in Clerk of Court's case file).

IDEA is "frequently described as a model of 'cooperative federalism.'" *Little Rock School Dist.* v. *Mauney*, 183 F. 3d 816, 830 (CA8 1999). It "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] imposes significant requirements to be followed in the discharge of that responsibility." *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 183 (1982). For example, the Act mandates cooperation and reporting between state and federal educational authorities. Participating States must certify to the Secretary of Education that they have "policies and procedures" that will effectively meet the Act's conditions. 20 U. S. C. § 1412(a). (Unless otherwise noted, all citations to the Act are to the pre-2004 version of the statute because this is the version that was in effect during the proceedings below. We note, however, that nothing in the recent 2004 amendments, 118 Stat. 2674, appears to materially affect the rule announced here.) State educational agencies, in turn, must ensure that local schools and teachers are meeting the State's educational standards. §§ 1412(a)(11), 1412(a)(15)(A). Local educational agencies (school boards or other administrative bodies) can receive IDEA funds only if they certify to a state educa-

tional agency that they are acting in accordance with the State's policies and procedures. § 1413(a)(1).

The core of the statute, however, is the cooperative process that it establishes between parents and schools. *Rowley, supra,* at 205–206 ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, . . . as it did upon the measurement of the resulting IEP against a substantive standard"). The central vehicle for this collaboration is the IEP process. State educational authorities must identify and evaluate disabled children, §§ 1414(a)–(c), develop an IEP for each one, § 1414(d)(2), and review every IEP at least once a year, § 1414(d)(4). Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide. § 1414(d)(1)(A).

Parents and guardians play a significant role in the IEP process. They must be informed about and consent to evaluations of their child under the Act. § 1414(c)(3). Parents are included as members of "IEP teams." § 1414(d)(1)(B). They have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child." § 1415(b)(1). They must be given written prior notice of any changes in an IEP, § 1415(b)(3), and be notified in writing of the procedural safeguards available to them under the Act, § 1415(d)(1). If parents believe that an IEP is not appropriate, they may seek an administrative "impartial due process hearing." § 1415(f). School districts may also seek such hearings, as Congress clarified in the 2004 amendments. See S. Rep. No. 108–185, p. 37 (2003). They may do so, for example, if they wish to change an existing IEP but the parents do not consent, or if parents refuse to allow their child to be evaluated. As a practical matter,

it appears that most hearing requests come from parents rather than schools. Brief for Petitioners 7.

Although state authorities have limited discretion to determine who conducts the hearings, § 1415(f)(1), and responsibility generally for establishing fair hearing procedures, § 1415(a), Congress has chosen to legislate the central components of due process hearings. It has imposed minimal pleading standards, requiring parties to file complaints setting forth "a description of the nature of the problem," § 1415(b)(7)(B)(ii), and "a proposed resolution of the problem to the extent known and available . . . at the time," § 1415(b)(7)(B)(iii). At the hearing, all parties may be accompanied by counsel, and may "present evidence and confront, cross-examine, and compel the attendance of witnesses." §§ 1415(h)(1)–(2). After the hearing, any aggrieved party may bring a civil action in state or federal court. § 1415(i)(2). Prevailing parents may also recover attorney's fees. § 1415(i)(3)(B). Congress has never explicitly stated, however, which party should bear the burden of proof at IDEA hearings.

## B

This case concerns the educational services that were due, under IDEA, to petitioner Brian Schaffer. Brian suffers from learning disabilities and speech-language impairments. From prekindergarten through seventh grade he attended a private school and struggled academically. In 1997, school officials informed Brian's mother that he needed a school that could better accommodate his needs. Brian's parents contacted respondent Montgomery County Public Schools System (MCPS) seeking a placement for him for the following school year.

MCPS evaluated Brian and convened an IEP team. The committee generated an initial IEP offering Brian a place in either of two MCPS middle schools. Brian's parents were not satisfied with the arrangement, believing that Brian

needed smaller classes and more intensive services. The Schaffers thus enrolled Brian in another private school, and initiated a due process hearing challenging the IEP and seeking compensation for the cost of Brian's subsequent private education.

In Maryland, IEP hearings are conducted by administrative law judges (ALJs). See Md. Educ. Code Ann. §8–413(c) (Lexis 2004). After a 3-day hearing, the ALJ deemed the evidence close, held that the parents bore the burden of persuasion, and ruled in favor of the school district. The parents brought a civil action challenging the result. The United States District Court for the District of Maryland reversed and remanded, after concluding that the burden of persuasion is on the school district. *Brian S. v. Vance,* 86 F. Supp. 2d 538 (2000). Around the same time, MCPS offered Brian a placement in a high school with a special learning center. Brian's parents accepted, and Brian was educated in that program until he graduated from high school. The suit remained alive, however, because the parents sought compensation for the private school tuition and related expenses.

Respondents appealed to the United States Court of Appeals for the Fourth Circuit. While the appeal was pending, the ALJ reconsidered the case, deemed the evidence truly in "equipoise," and ruled in favor of the parents. The Fourth Circuit vacated and remanded the appeal so that it could consider the burden of proof issue along with the merits on a later appeal. The District Court reaffirmed its ruling that the school district has the burden of proof. 240 F. Supp. 2d 396 (Md. 2002). On appeal, a divided panel of the Fourth Circuit reversed. Judge Michael, writing for the majority, concluded that petitioners offered no persuasive reason to "depart from the normal rule of allocating the burden to the party seeking relief." 377 F. 3d 449, 453 (2004). We granted certiorari, 543 U. S. 1145 (2005), to resolve the fol-

lowing question: At an administrative hearing assessing the appropriateness of an IEP, which party bears the burden of persuasion?

## II

## A

The term "burden of proof" is one of the "slipperiest member[s] of the family of legal terms." 2 J. Strong, McCormick on Evidence § 342, p. 433 (5th ed. 1999) (hereinafter McCormick). Part of the confusion surrounding the term arises from the fact that historically, the concept encompassed two distinct burdens: the "burden of persuasion," *i. e.*, which party loses if the evidence is closely balanced, and the "burden of production," *i. e.*, which party bears the obligation to come forward with the evidence at different points in the proceeding. *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries,* 512 U. S. 267, 272 (1994). We note at the outset that this case concerns only the burden of persuasion, as the parties agree, Brief for Respondents 14; Reply Brief for Petitioners 15, and when we speak of burden of proof in this opinion, it is this to which we refer.

When we are determining the burden of proof under a statutory cause of action, the touchstone of our inquiry is, of course, the statute. The plain text of IDEA is silent on the allocation of the burden of persuasion. We therefore begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims. McCormick § 337, at 412 ("The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion"); C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003) ("Perhaps the broadest and most accepted idea is that the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims").

Thus, we have usually assumed without comment that plaintiffs bear the burden of persuasion regarding the essential aspects of their claims. For example, Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, does not directly state that plaintiffs bear the "ultimate" burden of persuasion, but we have so concluded. *St. Mary's Honor Center* v. *Hicks*, 509 U. S. 502, 511 (1993); *id.*, at 531 (SOUTER, J., dissenting). In numerous other areas, we have presumed or held that the default rule applies. See, *e. g.*, *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992) (standing); *Cleveland* v. *Policy Management Systems Corp.*, 526 U. S. 795, 806 (1999) (Americans with Disabilities Act); *Hunt* v. *Cromartie*, 526 U. S. 541, 553 (1999) (equal protection); *Wharf (Holdings) Ltd.* v. *United Int'l Holdings, Inc.*, 532 U. S. 588, 593 (2001) (securities fraud); *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975) (preliminary injunctions); *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 287 (1977) (First Amendment). Congress also expressed its approval of the general rule when it chose to apply it to administrative proceedings under the Administrative Procedure Act, 5 U. S. C. § 556(d); see also *Greenwich Collieries, supra*, at 271.

The ordinary default rule, of course, admits of exceptions. See McCormick § 337, at 412–415. For example, the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions. See, *e. g.*, *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 44–45 (1948). Under some circumstances this Court has even placed the burden of persuasion over an entire claim on the defendant. See *Alaska Dept. of Environmental Conservation* v. *EPA*, 540 U. S. 461, 494 (2004). But while the normal default rule does not solve all cases, it certainly solves most of them. Decisions that place the *entire* burden of persuasion on the opposing party at the *outset* of a proceeding—as petitioners urge us to do here—are extremely rare. Absent some reason to believe that Congress intended otherwise, therefore,

we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.

## B

Petitioners contend first that a close reading of IDEA's text compels a conclusion in their favor.  They urge that we should interpret the statutory words "due process" in light of their constitutional meaning, and apply the balancing test established by *Mathews* v. *Eldridge,* 424 U. S. 319 (1976). Even assuming that the Act incorporates constitutional due process doctrine, *Eldridge* is no help to petitioners because "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Lavine* v. *Milne,* 424 U. S. 577, 585 (1976).

Petitioners next contend that we should take instruction from the lower court opinions of *Mills* v. *Board of Education,* 348 F. Supp. 866 (DC 1972), and *Pennsylvania Association for Retarded Children* v. *Pennsylvania,* 334 F. Supp. 1257 (ED Pa. 1971) (hereinafter *PARC*).  IDEA's drafters were admittedly guided "to a significant extent" by these two landmark cases.  *Rowley,* 458 U. S., at 194.  As the court below noted, however, the fact that Congress "took a number of the procedural safeguards from *PARC* and *Mills* and wrote them directly into the Act" does not allow us to "conclude . . . that Congress intended to adopt the ideas that it failed to write into the text of the statute."  377 F. 3d, at 455.

Petitioners also urge that putting the burden of persuasion on school districts will further IDEA's purposes because it will help ensure that children receive a free appropriate public education.  In truth, however, very few cases will be in evidentiary equipoise.  Assigning the burden of persuasion to school districts might encourage schools to put more resources into preparing IEPs and presenting their evidence. But IDEA is silent about whether marginal dollars should

be allocated to litigation and administrative expenditures or to educational services. Moreover, there is reason to believe that a great deal is already spent on the administration of the Act. Litigating a due process complaint is an expensive affair, costing schools approximately $8,000 to $12,000 per hearing. See Department of Education, J. Chambers, J. Harr, & A. Dhanani, What Are We Spending on Procedural Safeguards in Special Education 1999–2000, p. 8 (May 2003) (prepared under contract by American Institutes for Research, Special Education Expenditure Project). Congress has also repeatedly amended the Act in order to reduce its administrative and litigation-related costs. For example, in 1997 Congress mandated that States offer mediation for IDEA disputes. § 615(e) of IDEA, as added by § 101 of the Individuals with Disabilities Education Act Amendments of 1997, Pub. L. 105–17, 111 Stat. 90, 20 U. S. C. § 1415(e). In 2004, Congress added a mandatory "resolution session" prior to any due process hearing. § 615(f)(1)(B) of IDEA, as added by § 101 of the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108–446, 118 Stat. 2720, 20 U. S. C. A. § 1415(f)(1)(B) (Supp. 2005). It also made new findings that "[p]arents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways," and that "[t]eachers, schools, local educational agencies, and States should be relieved of irrelevant and unnecessary paperwork burdens that do not lead to improved educational outcomes." §§ 1400(c)(8)–(9).

Petitioners in effect ask this Court to assume that every IEP is invalid until the school district demonstrates that it is not. The Act does not support this conclusion. IDEA relies heavily upon the expertise of school districts to meet its goals. It also includes a so-called "stay-put" provision, which requires a child to remain in his or her "then-current educational placement" during the pendency of an IDEA hearing. § 1415(j). Congress could have required that a

child be given the educational placement that a parent requested during a dispute, but it did no such thing. Congress appears to have presumed instead that, if the Act's procedural requirements are respected, parents will prevail when they have legitimate grievances. See *Rowley, supra,* at 206 (noting the "legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP").

Petitioners' most plausible argument is that "[t]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *United States* v. *New York, N. H. & H. R. Co.,* 355 U. S. 253, 256, n. 5 (1957); see also *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 626 (1993). But this "rule is far from being universal, and has many qualifications upon its application." *Greenleaf's Lessee* v. *Birth,* 6 Pet. 302, 312 (1832); see also McCormick § 337, at 413 ("Very often one must plead and prove matters as to which his adversary has superior access to the proof"). School districts have a "natural advantage" in information and expertise, but Congress addressed this when it obliged schools to safeguard the procedural rights of parents and to share information with them. See *School Comm. of Burlington* v. *Department of Ed. of Mass.,* 471 U. S. 359, 368 (1985). As noted above, parents have the right to review all records that the school possesses in relation to their child. § 1415(b)(1). They also have the right to an "independent educational evaluation of the[ir] child." *Ibid.* The regulations clarify this entitlement by providing that a "parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 CFR § 300.502(b)(1) (2005). IDEA thus ensures parents access to an expert who can evaluate all the materials that the school

must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.

Additionally, in 2004, Congress added provisions requiring school districts to answer the subject matter of a complaint in writing, and to provide parents with the reasoning behind the disputed action, details about the other options considered and rejected by the IEP team, and a description of all evaluations, reports, and other factors that the school used in coming to its decision. § 615(c)(2)(B)(i)(I) of IDEA, as added by § 101 of Pub. L. 108–446, 118 Stat. 2718, 20 U. S. C. § 1415(c)(2)(B)(i)(I) (2000 ed., Supp. V). Prior to a hearing, the parties must disclose evaluations and recommendations that they intend to rely upon. 20 U. S. C. § 1415(f)(2). IDEA hearings are deliberately informal and intended to give ALJs the flexibility that they need to ensure that each side can fairly present its evidence. IDEA, in fact, requires state authorities to organize hearings in a way that guarantees parents and children the procedural protections of the Act. See § 1415(a). Finally, and perhaps most importantly, parents may recover attorney's fees if they prevail. § 1415(i)(3)(B). These protections ensure that the school bears no unique informational advantage.

## III

Finally, respondents and several States urge us to decide that States may, if they wish, override the default rule and put the burden always on the school district. Several States have laws or regulations purporting to do so, at least under some circumstances. See, e. g., Minn. Stat. § 125A.091, subd. 16 (2004); Ala. Admin. Code Rule 290–8–9–.08(8)(c)(6) (Supp. 2004); Alaska Admin. Code, tit. 4, § 52.550(e)(9) (2003); Del. Code Ann., Tit. 14, § 3140 (1999). Because no such law or regulation exists in Maryland, we need not decide this issue

today. JUSTICE BREYER contends that the allocation of the burden ought to be left *entirely* up to the States. But neither party made this argument before this Court or the courts below. We therefore decline to address it.

We hold no more than we must to resolve the case at hand: The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief. In this case, that party is Brian, as represented by his parents. But the rule applies with equal effect to school districts: If they seek to challenge an IEP, they will in turn bear the burden of persuasion before an ALJ. The judgment of the United States Court of Appeals for the Fourth Circuit is, therefore, affirmed.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

JUSTICE STEVENS, concurring.

It is common ground that no single principle or rule solves all cases by setting forth a general test for ascertaining the incidence of proof burdens when both a statute and its legislative history are silent on the question. See *Alaska Dept. of Environmental Conservation* v. *EPA,* 540 U. S. 461, 494, n. 17 (2004); see also *ante,* at 57; *post,* at 63 (GINSBURG, J., dissenting). Accordingly, I do not understand the majority to disagree with the proposition that a court, taking into account "'policy considerations, convenience, and fairness,'" *post,* at 63 (GINSBURG, J., dissenting), could conclude that the purpose of a statute is best effectuated by placing the burden of persuasion on the defendant. Moreover, I agree with much of what JUSTICE GINSBURG has written about the special aspects of this statute. I have, however, decided to join the Court's disposition of this case, not only for the reasons set forth in JUSTICE O'CONNOR's opinion, but also because I believe that we should presume that public school officials

are properly performing their difficult responsibilities under this important statute.

JUSTICE GINSBURG, dissenting.

When the legislature is silent on the burden of proof, courts ordinarily allocate the burden to the party initiating the proceeding and seeking relief. As the Fourth Circuit recognized, however, "other factors," prime among them "policy considerations, convenience, and fairness," may warrant a different allocation. 377 F. 3d 449, 452 (2004) (citing 2 J. Strong, McCormick on Evidence §337, p. 415 (5th ed. 1999) (allocation of proof burden "will depend upon the weight . . . given to any one or more of several factors, including: . . . special policy considerations[,] convenience, [and] fairness")); see also 9 J. Wigmore, Evidence §2486, p. 291 (J. Chadbourn rev. ed. 1981) (assigning proof burden presents "a question of policy and fairness based on experience in the different situations"). The Court has followed the same counsel. See *Alaska Dept. of Environmental Conservation* v. *EPA*, 540 U. S. 461, 494, n. 17 (2004) ("No 'single principle or rule . . . solve[s] all cases and afford[s] a general test for ascertaining the incidence' of proof burdens." (quoting Wigmore, *supra*, §2486, p. 288; emphasis deleted)). For reasons well stated by Circuit Judge Luttig, dissenting in the Court of Appeals, 377 F. 3d, at 456–459, I am persuaded that "policy considerations, convenience, and fairness" call for assigning the burden of proof to the school district in this case.

The Individuals with Disabilities Education Act (IDEA), 20 U. S. C. §1400 *et seq.*, was designed to overcome the pattern of disregard and neglect disabled children historically encountered in seeking access to public education. See §1400(c)(2) (congressional findings); S. Rep. No. 94–168, pp. 6, 8–9 (1975); *Mills* v. *Board of Ed. of District of Columbia,* 348 F. Supp. 866 (DC 1972); *Pennsylvania Assn. for Retarded Children* v. *Pennsylvania,* 334 F. Supp. 1257 (ED Pa. 1971),

and 343 F. Supp. 279 (ED Pa. 1972). Under typical civil rights and social welfare legislation, the complaining party must allege and prove discrimination or qualification for statutory benefits. See, *e. g., St. Mary's Honor Center* v. *Hicks*, 509 U. S. 502, 511 (1993) (Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*); *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267, 270 (1994) (Black Lung Benefits Act, 30 U. S. C. § 901 *et seq.*). The IDEA is atypical in this respect: It casts an affirmative, beneficiary-specific obligation on providers of public education. School districts are charged with responsibility to offer to each disabled child an individualized education program (IEP) suitable to the child's special needs. 20 U. S. C. §§ 1400(d)(1), 1412(a)(4), 1414(d). The proponent of the IEP, it seems to me, is properly called upon to demonstrate its adequacy.

Familiar with the full range of education facilities in the area, and informed by "their experiences with other, similarly-disabled children," 377 F. 3d, at 458 (Luttig, J., dissenting), "the school district is . . . in a far better position to demonstrate that it has fulfilled [its statutory] obligation than the disabled student's parents are in to show that the school district has failed to do so," *id.*, at 457. Accord *Oberti* v. *Board of Ed. of Borough of Clementon School Dist.*, 995 F. 2d 1204, 1219 (CA3 1993) ("In practical terms, the school has an advantage when a dispute arises under the Act: the school has better access to relevant information, greater control over the potentially more persuasive witnesses (those who have been directly involved with the child's education), and greater overall educational expertise than the parents."); *Lascari* v. *Board of Ed. of Ramapo Indian Hills Regional High School Dist.*, 116 N. J. 30, 45–46, 560 A. 2d 1180, 1188–1189 (1989) (in view of the school district's "better access to relevant information," parent's obligation "should be merely to place in issue the appropriateness of the IEP. The school board should then bear the burden of proving that

the IEP was appropriate. In reaching that result, we have sought to implement the intent of the statutory and regulatory schemes.").[1]

Understandably, school districts striving to balance their budgets, if "[l]eft to [their] own devices," will favor educational options that enable them to conserve resources. *Deal v. Hamilton County Bd. of Ed.*, 392 F. 3d 840, 864–865 (CA6 2004). Saddled with a proof burden in administrative "due process" hearings, parents are likely to find a district-proposed IEP "resistant to challenge." 377 F. 3d, at 459 (Luttig, J., dissenting). Placing the burden on the district to show that its plan measures up to the statutorily mandated "free appropriate public education," 20 U. S. C. § 1400(d)(1)(A), will strengthen school officials' resolve to choose a course genuinely tailored to the child's individual needs.[2]

The Court acknowledges that "[a]ssigning the burden of persuasion to school districts might encourage schools to put more resources into preparing IEPs." *Ante*, at 58. Curiously, the Court next suggests that resources spent on developing IEPs rank as "administrative expenditures" not as expenditures for "educational services." *Ante*, at 59. Costs entailed in the preparation of suitable IEPs, however, are

---

[1] The Court suggests that the IDEA's stay-put provision, 20 U. S. C. § 1415(j), supports placement of the burden of persuasion on the parents. *Ante*, at 59–60. The stay-put provision, however, merely preserves the status quo. It would work to the advantage of the child and the parents when the school seeks to cut services offered under a previously established IEP. True, Congress did not require that "a child be given the educational placement that a parent requested during a dispute." *Ibid.* But neither did Congress require that the IEP advanced by the school district go into effect during the pendency of a dispute.

[2] The Court observes that decisions placing "the *entire* burden of persuasion on the opposing party at the *outset* of a proceeding . . . are extremely rare." *Ante*, at 57. In cases of this order, however, the persuasion burden is indivisible. It must be borne *entirely* by one side or the other: Either the school district must establish the adequacy of the IEP it has proposed or the parents must demonstrate the plan's inadequacy.

the very expenditures necessary to ensure each child covered by the IDEA access to a free appropriate education. These outlays surely relate to "educational services." Indeed, a carefully designed IEP may ward off disputes productive of large administrative or litigation expenses.

This case is illustrative. Not until the District Court ruled that the school district had the burden of persuasion did the school design an IEP that met Brian Schaffer's special educational needs. See *ante*, at 55; Tr. of Oral Arg. 21–22 (Counsel for the Schaffers observed that "Montgomery County . . . gave [Brian] the kind of services he had sought from the beginning . . . once [the school district was] given the burden of proof."). Had the school district, in the first instance, offered Brian a public or private school placement equivalent to the one the district ultimately provided, this entire litigation and its attendant costs could have been avoided.

Notably, nine States, as friends of the Court, have urged that placement of the burden of persuasion on the school district best comports with the IDEA's aim. See Brief for Commonwealth of Virginia et al. as *Amici Curiae*. If allocating the burden to school districts would saddle school systems with inordinate costs, it is doubtful that these States would have filed in favor of petitioners. Cf. Brief for United States as *Amicus Curiae* Supporting Appellees Urging Affirmance in No. 00–1471 (CA4), p. 12 ("Having to carry the burden of proof regarding the adequacy of its proposed IEP . . . should not substantially increase the workload for the school.").[3]

One can demur to the Fourth Circuit's observation that courts "do not automatically assign the burden of proof to the side with the bigger guns," 377 F. 3d, at 453, for no such reflexive action is at issue here. It bears emphasis that "the vast majority of parents whose children require the benefits and protections provided in the IDEA" lack "knowledg[e]

[3] Before the Fourth Circuit, the United States filed in favor of the Schaffers; in this Court, the United States supported Montgomery County.

about the educational resources available to their [child]" and the "sophisticat[ion]" to mount an effective case against a district-proposed IEP. *Id.*, at 458 (Luttig, J., dissenting); cf. 20 U. S. C. § 1400(c)(7)–(10). See generally Department of Education, M. Wagner, C. Marder, J. Blackorby, & D. Cardoso, The Children We Serve: The Demographic Characteristics of Elementary and Middle School Students with Disabilities and their Households (Sept. 2002) (prepared under contract by SRI International, Special Education Elementary Longitudinal Study), http://www.seels.net/designdocs/ SEELS_Children_We_Serve_ Report.pdf (as visited Nov. 8, 2005, and available in Clerk of Court's case file). In this setting, "the party with the 'bigger guns' also has better access to information, greater expertise, and an affirmative obligation to provide the contested services." 377 F. 3d, at 458 (Luttig, J., dissenting). Policy considerations, convenience, and fairness, I think it plain, point in the same direction. Their collective weight warrants a rule requiring a school district, in "due process" hearings, to explain persuasively why its proposed IEP satisfies the IDEA's standards. *Ibid.* I would therefore reverse the judgment of the Fourth Circuit.

JUSTICE BREYER, dissenting.

As the majority points out, the Individuals with Disabilities Education Act (Act), 20 U. S. C. § 1400 *et seq.*, requires school districts to "identify and evaluate disabled children, . . . develop an [Individualized Education Program] for each one . . . , and review every IEP at least once a year." *Ante*, at 53. A parent dissatisfied with "any matter relating [1] to the identification, evaluation, or educational placement of the child," or [2] to the "provision of a free appropriate public education" of the child, has the opportunity "to resolve such disputes through a mediation process." 20 U. S. C. §§ 1415(a), (b)(6)(A), (k) (2000 ed., Supp. V). The Act further provides the parent with "an opportunity for an im-

partial due process hearing" provided by the state or local education agency. § 1415(f)(1)(A). If provided locally, either party can appeal the hearing officer's decision to the state educational agency. § 1415(g). Finally, the Act allows any "party aggrieved" by the results of the state hearing(s) "to bring a civil action" in a federal district court. § 1415(i)(2)(A). In sum, the Act provides for school board action, followed by (1) mediation, (2) an impartial state due process hearing with the possibility of state appellate review, and (3) federal district court review.

The Act also sets forth minimum procedures that the parties, the hearing officer, and the federal court must follow. See, e. g., § 1415(f)(1) (notice); § 1415(f)(2) (disclosures); § 1415(f)(3) (limitations on who may conduct the hearing); § 1415(g) (right to appeal); § 1415(h)(1) ("the right to be accompanied and advised by counsel"); § 1415(h)(2) ("the right to present evidence and confront, cross-examine, and compel the attendance of witnesses"); § 1415(h)(3) (the right to a transcript of the proceeding); § 1415(h)(4) ("the right to written . . . findings of fact and decisions"). Despite this detailed procedural scheme, the Act is silent on the question of who bears the burden of persuasion at the state "due process" hearing.

The statute's silence suggests that Congress did not think about the matter of the burden of persuasion. It is, after all, a relatively minor issue that should not often arise. That is because the parties will ordinarily introduce considerable evidence (as in this case where the initial 3-day hearing included testimony from 10 witnesses, 6 qualified as experts, and more than 50 exhibits). And judges rarely hesitate to weigh evidence, even highly technical evidence, and to decide a matter on the merits, even when the case is a close one. Thus, cases in which an administrative law judge (ALJ) finds the evidence in precise equipoise should be few and far between. Cf. *O'Neal* v. *McAninch*, 513 U. S. 432, 436–437 (1995). See also Individuals with Disabilities Education Im-

provement Act of 2004, Pub. L. 108–446, §§ 615(f)(3)(A)(ii)–(iv), 118 Stat. 2721, 20 U. S. C. §§ 1415(f)(3)(A)(ii)–(iv) (2000 ed., Supp. V) (requiring appointment of ALJ with technical capacity to understand Act).

Nonetheless, the hearing officer held that before him was that *rara avis*—a case of perfect evidentiary equipoise. Hence we must infer from Congress' silence (and from the rest of the statutory scheme) which party—the parents or the school district—bears the burden of persuasion.

One can reasonably argue, as the Court holds, that the risk of nonpersuasion should fall upon the "individual desiring change." That, after all, is the rule courts ordinarily apply when an individual complains about the lawfulness of a government action. *E. g., ante,* at 56–61 (opinion of the Court); 377 F. 3d 449 (CA4 2004) (case below); *Devine* v. *Indian River County School Bd.,* 249 F. 3d 1289 (CA11 2001). On the other hand, one can reasonably argue to the contrary, that, given the technical nature of the subject matter, its human importance, the school district's superior resources, and the district's superior access to relevant information, the risk of nonpersuasion ought to fall upon the district. *E. g., ante,* p. 63 (GINSBURG, J., dissenting); 377 F. 3d, at 456–459 (Luttig, J., dissenting); *Oberti* v. *Board of Ed. of Borough of Clementon School Dist.;* 995 F. 2d 1204 (CA3 1993); *Lascari* v. *Board of Ed. of Ramapo Indian Hills High School Dist.,* 116 N. J. 30, 560 A. 2d 1180 (1989). My own view is that Congress took neither approach. It did not decide the "burden of persuasion" question; instead it left the matter to the States for decision.

The Act says that the "establish[ment]" of "procedures" is a matter for the "State" and its agencies. § 1415(a). It adds that the hearing in question, an administrative hearing, is to be conducted by the "State" or "local educational agency." 20 U. S. C. § 1415(f)(1)(A) (2000 ed., Supp. V). And the statute as a whole foresees state implementation of federal standards. § 1412(a); *Cedar Rapids Community School Dist.* v.

*Garret F.*, 526 U. S. 66, 68 (1999); *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 208 (1982). The minimum federal procedural standards that the Act specifies are unrelated to the "burden of persuasion" question. And different States, consequently and not surprisingly, have resolved it in different ways. See, *e. g.*, Alaska Admin. Code, tit. 4, § 52.550(e)(9) (2003) (school district bears burden); Ala. Admin. Code Rule 290–8–9–.08(8)(c)(6)(ii)(I) (Supp. 2004) (same); Conn. Agencies Regs. § 10–76h–14 (2005) (same); Del. Code Ann., Tit. 14, § 3140 (1999) (same); 1 D. C. Mun. Regs., tit. 5, § 3030.3 (2003) (same); W. Va. Code Rules § 126–16–8.1.11(c) (2005) (same); Ind. Admin. Code, tit. 511, Rule 7–30–3 (2003) (incorporating by reference Ind. Code § 4–21.5–3–14 (West 2002)) (moving party bears burden); 7 Ky. Admin. Regs., tit. 707, ch. 1:340, § 7(4) (2004) (incorporating by reference Ky. Rev. Stat. Ann. § 13B.090(7) (Lexis 2003)) (same); Ga. Comp. Rules & Regs., Rule 160–4–7–.18(1)(g)(8) (2002) (burden varies depending upon remedy sought); Minn. Stat. Ann. § 125A.091, subd. 16 (West Supp. 2005) (same). There is no indication that this lack of uniformity has proved harmful.

Nothing in the Act suggests a need to fill every interstice of the Act's remedial scheme with a uniform federal rule. See *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 98 (1991) (citations omitted). And should some such need arise—*i. e.*, if nonuniformity or a particular state approach were to prove problematic—the Federal Department of Education, expert in the area, might promulgate a uniform federal standard, thereby limiting state choice. 20 U. S. C. § 1406(a) (2000 ed., Supp. V); *Irving Independent School Dist.* v. *Tatro*, 468 U. S. 883, 891–893 (1984); see also *Barnhart* v. *Walton*, 535 U. S. 212, 217–218 (2002); *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251, 256–257 (1995); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984).

Most importantly, Congress has made clear that the Act itself represents an exercise in "cooperative federalism." See *ante*, at 52–53 (opinion of the Court). Respecting the States' right to decide this procedural matter here, where education is at issue, where expertise matters, and where costs are shared, is consistent with that cooperative approach. See *Wisconsin Dept. of Health and Family Servs.* v. *Blumer*, 534 U. S. 473, 495 (2002) (when interpreting statutes "designed to advance cooperative federalism[,] . . . we have not been reluctant to leave a range of permissible choices to the States"). Cf. *Smith* v. *Robbins*, 528 U. S. 259, 275 (2000); *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). And judicial respect for such congressional determinations is important. Indeed, in today's technologically and legally complex world, whether court decisions embody that kind of judicial respect may represent the true test of federalist principle. See *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 420 (1999) (BREYER, J., concurring in part and dissenting in part).

Maryland has no special state law or regulation setting forth a special IEP-related burden of persuasion standard. But it does have rules of state administrative procedure and a body of state administrative law. The state ALJ should determine how those rules, or other state law, applies to this case. Cf., *e. g.*, Ind. Admin. Code, tit. 511, Rule 7–30–3 (2003) (hearings under the Act conducted in accord with general state administrative law); 7 Ky. Admin. Regs., tit. 707, ch. 1:340, Section 7(4) (same). Because the state ALJ did not do this (*i. e.*, he looked for a federal, not a state, burden of persuasion rule), I would remand this case.