WILKINSON, Circuit Judge, dissenting: The majority refuses to so much as mention a state’s sovereign interest in its own civil service. The place of state governments in our Republic has quite passed it by. Respect for sthtes qua states fails to merit even the slight courtesies of lip service. The majority instead sounds a requiem of silence: states as constitutional entities have quietly expired. And yet ours is not a Constitution of federal power only. The EEOC should not be able to bring a case as marginal as this one against a state. State workforces are highly regulated and regimented, and state law provides remedies for gender discrimination in all its forms. Simply put, state civil service systems are not hotbeds of gender bias, as this feeble suit makes all too clear. I recognize that the EEOC is not acting in an adjudicative or regulatory capacity in this case. By bringing suit, though, the agency has consigned the state’s sovereign interest in its own workforce wholly to the hands of federal authority. Here, a federal agency is bringing suit, the federal courts are deciding the suit, and federal law is providing the applicable rule of decision. In combination, this assertion of federal authority diminishes to an unacceptable extent the proper role of states in our constitutional system. Perhaps this federal takeover could be pardoned if this were a lawsuit of substance. But this is a thin, slight action. Even if a federal statute can constitutionally be held to apply to the states, states can still utilize the Tenth Amendment to vindicate in litigation their constitutionally protected interests. At a very minimum, a case like this should not proceed to trial absent clear and convincing evidence of the state’s misconduct. The lax preponderance burden and summary judgment standard may be properly protective of a plaintiffs trial rights in most instances. But here they operate only to further subordinate a state’s status. For a federal agency to bring this tenuous case raises serious constitutional questions, and makes one wonder if Washington’s overlords even know what dual sovereignty is all about. There are remedies for this kind of overreach, which I shall promptly address. I. Ours is a federal system of government. It was carefully designed to strike a balance between the need for enumerated federal authority and respect for the residual sovereignty of the states. One half of that balance the majority now leaves wholly in shadow. In fact, the majority does not even hint that this suit raises the question of the extent to which Congress’s power may constitutionally extend over state civil service systems. The answer to this question is fundamental to our constitutional structure, and it is one the Supreme Court has struggled with for decades. A. For present purposes, our story begins with National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), a case involving the Fair Labor Standards Act (FLSA). The FLSA initially covered only private employers and was upheld as a valid exercise of Congress’s commerce power. See United States v. Darby, 312 U.S. 100, 115-16, 61 S.Ct. 451, 85 L.Ed. 609 (1941). Congress later amended it to also cover state employers. An assortment of states, cities, and their representatives challenged these amendments as unconstitutional. See National League of Cities, 426 U.S. at 836-37, 96 S.Ct. 2465. They argued that “our federal system of government imposes definite limits upon the authority of Congress to regulate the activities of the States as States by means of the commerce power.” Id. at 842, 96 S.Ct. 2465. The Supreme Court agreed. It explained that Congress’s commerce power, while broad, was nonetheless subject to distinct limitations. Id. at 841-43, 96 S.Ct. 2465. One such limitation is the structure of our federal system as reflected in the Tenth Amendment’s reservation of powers to the states. Id. at 842-43, 96 S.Ct. 2465. The Court stressed that “the States as States stand on a quite different footing from an individual or a corporation when challenging the exercise of Congress’ power to regulate commerce.” Id. at 854, 96 S.Ct. 2465. States are themselves “coordinate element[s] in the system established by the Framers for governing our Federal Union.” Id. at 849, 96 S.Ct. 2465. Allowing Congress to regulate “States in their capacities as sovereign governments” under the guise of the commerce power “would impair the States’ ‘ability to function effectively in a federal system.’ ” Id. at 852, 96 S.Ct. 2465 (quoting Fry v. United States, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975)). For these reasons, the Court held that Congress lacked authority under the Commerce Clause to extend the FLSA’s minimum-wage and overtime provisions to the States “in areas of traditional governmental functions.” Id. In Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Supreme Court by a 5-4 vote abandoned the project of limiting federal interference with traditional state functions. That case presented the question whether “municipal ownership and operation of a mass-transit system” was a “traditional governmental function.” Id. at 530, 105 S.Ct. 1005. Rather than answer this question, the majority opted to jettison the entire inquiry. It reasoned that the task of identifying traditional governmental functions was “difficult, if not impossible” because the Court had been unable to craft a well-defined “organizing principle” in close to a decade. Id. at 539, 105 S.Ct. 1005. And despite recognizing that Congress has only limited powers in our constitutional system, the majority determined that the Court had little role to play in enforcing those limits. It deemed the “basic limit on the federal commerce power” to be more properly policed through the “political process” and “state participation in federal governmental action” than in the courts. Id. at 556, 105 S.Ct. 1005. Based on this analysis, the Court overruled National League of Cities and concluded that the FLSA could be constitutionally applied to state transit systems. Id. at 531, 554, 105 S.Ct. 1005. Justices Rehnquist and O’Connor in dissent predicted that, like the reign of National League of Cities before it, Garcia’s rule would be finite. Justice Rehnquist predicted that the vision of federalism espoused in National League of Cities would “in time again command the support of a majority of this Court.” Id. at 580, 105 S.Ct. 1005 (Rehnquist, J., dissenting). Justice O’Connor agreed. She forecast that the Court would “in time again assume its constitutional responsibility” for “over-seeling] the Federal Government’s compliance with its duty to respect the legitimate interests of the States.” Id. at 581, 589, 105 S.Ct. 1005 (O’Connor, J., dissenting). True to these predictions, in the years since Garcia, the Supreme Court has proceeded to chip away at that case’s underlying rationale. The Court has rejected discrete attempts at federal overreach and exhibited its commitment to protecting the place of states in the constitutional scheme. See, e.g., United States v. Morrison, 529 U.S. 598, 617-19, 120 S.Ct. 1740, 146 L.Edüd 658 (2000) (holding that the Violence Against Women Act’s civil remedy for the victims of gender-motivated violence exceeded Congress’s commerce power because regulation of “intrastate violence ... has always been the province of the States”); Alden v. Maine, 527 U.S. 706, 754, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding that the FLSA exceeded Congress’s Article I powers by abrogating state sovereign immunity in state courts); Printz v. United States, 521 U.S. 898, 919, 933, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding that ther Brady. Handgun Violence Prevention Act violated the Tenth Amendment by conscripting state law enforcement officers to perform back-. ground checks on prospective handgun purchasers); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 71-73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that the Indian Gaming Regulatory Act violated the Eleventh Amendment by abrogating state sovereign- immunity in federal courts); United States v. Lopez, 514 U.S. 549, 564-68, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (holding that the Gun-Free School Zones Act’s prohibition on carrying firearms in school zones exceeded Congress’s commerce power because it regulated a noneconomic activity, in an area “where States historically have been sovereign”); New York v. United States, 505 U.S. 144, 177, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding that the Low-Level Radioactive Waste Policy Act exceeded Congress’s commerce power because it compelled states to regulate the disposal of radioactive waste according to Congress’s instruction). Overruling Garcia is not a step any court would take lightly. Nor is it.one we are even empowered to take. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (“[T]he Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”). But it is not improper for us to observe that in the wake of Gwcia, the states’ corporeal interest in our constitutional order has been left remarkably denuded. A state’s right to manage its own workforce lies at the heart of this interest. This organic interest of the states differs from the more peripheral interests implicated by many of the abovementioned holdings. The organic interest of governments protects their ability to proceed as autonomous bodies on a day-to-day basis. Or, to use an indelicate phrase, it relates to the states’ control over their own bodily functions. To say that the sole constraints on federal oversight of state organic functions are political is to ignore centuries of growth in the sheer size of the federal government, centuries of expansion in the scope of federal control and areas of federal oversight, and centuries of experience with the appetite of one part of government to enhance its own power at another part’s expense. Much, of this federal growth was not only necessary but also salutary. Much of it helped to bind us economically as one nation and expand to all our most basic protections of civil rights and liberties. But applauding a development need not mean the loss of all sense of qualification and degree. The expanded federal role, for all its value, risks leaving states abandoned by the wayside. The concentration of federal power risks leaving liberty moribund and the vitality envisioned by the Framers dispiritingly inert. Instead of both checks and balances, we are now left with the prospect of irreversible centuries of neither. B, The states’ vulnerability to federal overreach is, as noted, alarming where their sovereign interests are at their zenith: in the management of their own workforces. States have passed extensive, gender-neutral regulations to govern their civil services. Such regulations can and often do include state remedies to address gender discrimination in all of its forms: the matter of pay inequity has not gone unnoticed. Maryland is no exception in this regard. Like the federal government, Maryland has its own Grade/Step system and its own Equal Pay for Equal Work Act, which prohibits “paying a wage to employees of one sex or gender identity at a rate .less than the rate paid to employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type.” Md. Code, Lab. & Empl. § 3-304(b)(1). This prohibition expressly applies to government employers, including the state itself. Id. at § 3-301(b)(1). The Maryland legislature has also prohibited sex discrimination of all kinds in state employment, Md. Code, State Pers. & Pens. § 2-302(b)(1)(xi), and established an extensive Equal Employment Opportunity Program for civil servants that in many ways, mirrors the federal EEOC, id. at §.5-201 to -215. These regulations both reflect the state’s robust sovereign interest in this area and the utilization of that sovereign interest. to achieve gender pay equity. Maryland courts have hardly been reluctant to enforce these provisions, further obviating the need for unwarranted federal overreach, Indeed, Maryland courts have recognized that the EPA established only “a baséline rule” that state's may and do supplement in promoting pay equity, meriting robust enforcement of Maryland’s Equal Pay for Equal Work Act. Gaskins v. Marshall Craft Assocs., Inc., 110 Md.App. 705, 678 A.2d 615, 618-20 (1996). Other examples of Maryland courts' enforcing employment discrimination laws are simply too numerous to list, but even a brief sampling illustrates the state’s willingness to take seriously these claims. See, e.g., Manikhi v. Mass Transit Admin., 360 Md. 333, 758 A.2d 95 (2000) (finding that a state government employee had a valid claim for a hostile work environment based on sexual harassment); Molesworth v. Brandon, 341 Md. 621, 672 A.2d 608 (1996) (reinstating a jury verdict finding wrongful discharge based on sex discrimination); Edgewood Mgmt. Corp. v. Jackson, 212 Md.App. 177, 66 A.3d 1152 (2013) (upholding jury damages award to plaintiff alleging she was terminated on the' basis of her sex). The active partnership between Maryland’s legislature and courts reflects a healthy state system, not a hive of discrimination in need of a federal agency’s intrusion. And so the question thus arises: does the disregard of the Tenth Amendment and the disparagement of our federal system lead to a debilitating duplicativeness in law that brings but limited public benefit? One need not—and indeed, may not— go so- far as to revive National League of Cities to correct what has become a gross constitutional imbalance. But it does no violence to Garcia to require that when a federal agency seeks to supervise through litigation a state’s management of its own workforce, it must make a clear and convincing case for doing so rather than proceeding under the preponderance of the evidence threshold. This clear and convincing standard is a workable approach that would serve to screen out deprivations of state sovereignty for trivial purposes, while leaving serious problems open to the corrective of federal law. Steering this middle course would restore for state governments in this narrow and discrete area of paramount state interest some of the constitutional protection of which they have been inexcusably deprived. II. A. Violations of the EPA require that the employer have “discriminate[d] ... between employees on the basis of sex.” 29 U.S.C. § 206(d)(1). Therefore, there is no violation under the EPA if the salaries paid to employees are “made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.” Id. (emphasis added). The so-called disparities in pay identified by the EEOC here are all easily explained by neutral factors unrelated to gender, and these explanations are not in genuine dispute. The majority contends that “the burden on the employer necessarily is a heavy one,” Majority at 120, conveniently overlooking the fact that not just one, but no fewer than four affirmative defenses were provided by Congress in the statute. They were provided for a reason, namely to prevent courts from reshuffling gender-neutral salary structures to suit their policy preferences. And while the burden to establish an affirmative defense rests with the one raising it, the ultimate burden of proof almost always rests with “the party seeking relief.” Schaffer v. Weast, 546 U.S. 49, 57-58, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). The majority gets wound up in the question of a prima facie case, see Majority at 122 n.9, but the question here is whether there is an issue of triable fact regarding the state’s alleged pay inequity. The civil rights statutes of course all have shifting proof schemes. But the Supreme Court has cautioned that there is a danger in an appellate court getting wrapped around the axle of a proof scheme, which serves basically as a vehicle for the orderly presentation of evidence before the district courts. See U.S.P.S. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In fact, the Court has emphasized that we should not “treat discrimination differently from other ultimate questions of fact” or otherwise “evade[ ] the ultimate question of discrimination vel non.” Id. at 714-16, 103 S.Ct. 1478. On that ultimate question, plaintiffs, as noted, bear the burden. And a modest respect for state prerogatives with regard to the management of their own workforces requires that the quantum of evidence needed to satisfy that burden must be a clear and convincing one. Any diluted standard brings the Tenth Amendment and residual state authority under our Constitution up short. In discussing the elements of a prima facie case, the majority quite overlooks the fact that a state’s interest comes in by way of a Tenth Amendment defense, which it does not surrender even in those instances where a statute may be constitutionally applied to it.' Regardless, this case is so weak that it would falter even on the permissive terms the majority has set for it. As the district court recognized, summary judgment was appropriate in these circumstances. Its decision must be affirmed. B. The differences in pay identified by the EEOC are all readily explainable by state policies crediting prior state employment and by differences in the experience and qualifications of the individuals involved. There is no dispute that each of these explanations is a neutral factor unrelated to sex. States, which have a clear interest in serving their citizens well, may legitimately design a workforce composed of qualified individuals best able to deliver superior service. States are able to attract and retain such a workforce by tailoring their compensation schemes to the experience and credentials of the people they hire. The proposition is so obvious that to state it risks embarrassment. With respect to the case at hand, it is important for an insurance agency to be staffed by people who are specialized in the types of claims typical of that agency’s work. Because the majority skims over the relevant differences among the employees, I describe each of the state’s justifications for its employees’ salaries in turn.[1] The state of Maryland has an overarching policy of rewarding dedicated civil servants by .ensuring that their salaries reflect their years of state employment. First, Maryland law governing lateral transfers authorizes officials to freely reassign state employees to “another position of equal grade and service.” Md. Code, State Pers. & Pens. § 7-602(a)(1). By contrast, the State Personnel and Pensions Code provides for reassignment to a “position of a lower grade in any unit” only when an employee “applies] for a voluntary demotion.” Id. at § 7-602(c)(1). The record reflects that MIA applied these laws in a neutral manner to employees hired as lateral transfers, assigning them to grades and salaries equivalent to those held in their prior positions. Mary Jo Rogers, one of the complainants, was informed of her new position in MIA in a letter explaining: “Since this is a lateral transfer, your classification will remain ... Grade 15 step. 5 which equates to an annualized salary $ 47,018.” J.A. 92. Similarly, when the Associate Commissioner of the Insurance Fraud Division, Carolyn Henneman, recommended hiring Bruno Conticello, one of the comparators, her letter to the HR Director noted that he would need to be “offered a somewhat higher salary than the typical line investigator” in part because he was “already being paid significantly higher than that line salary” at his prior state job. J.A. 328. Maryland law also required MIA to take prior state employment into account in setting salaries in other ways. For example, former employeés who are reinstated in the civil service are entitled to “receive credit for time employed before separation”' when they are assigned to' a pay grade. Md. Code, State Pers. & Pens. § 2-601(c)(1). And Maryland employees transferring from a contract position to a budgeted position within the same principal unit “shall be given credit for service in the contractual position for the purpose of establishing” their pay grade. Id. at § 13-304. The complainants and the comparators were not similarly situated with respect to prior state employment. Rogers was the only complainant who was already employed by the state when she was hired as a Fraud Investigator. By contrast, among the comparators, Bruno Conticello, Maurice Xenos, and Jeffrey Gross were all employed by the state at the time they were hired as budgeted Fraud Investigators or Enforcement Officers. As noted above, Conticello’s salary reflected his lateral transfer. Xenos and Gross were both hired after acting as contract employees, and they were therefore statutorily entitled to credit for that time under § 13-304. Comparators Hurley and Jacobs were not employed by the state at the time they were hired, but the EEOC acknowledges that they nonetheless had creditable prior state • work' experience, affecting their starting salaries. EEOC Reply Br. 25. Differences in the extent of creditable prior state employment thus explain much of the variation in salaries among both the male and female employees: The EEOC does not dispute that, among the complainants, only Rogers' had prior state work experience at least equivalent to that of Conticello, Hurley, or Jacobs. And, predictably enough, Rogers was more highly compensated than the other two complainants. Not only that, she was given a higher starting salary than either Hurley or Jacobs. • Of course, prior state employment was not the only factor involved in setting starting salaries at MIA. Beyond prior state employment, there were also important differences in the qualifications and credentials of the complainants and comparators. Comparators Conticello and Hurley were both Certified Fraud Examiners, and Gross held an insurance producer (agent) license, credentials none of the complainants had achieved. Comparator Pennington had training from the National Fire Academy on arson investigations, highly relevant training in the insurance field that none of the complainants had. Xenos had a special expertise in title insurance, allowing him to serve a role at MIA that none of the complainants could have served. All of these credentials, held by the comparators and not by any of the complainants, are indisputably relevant to the work of MIA. And while all of the employees had at least some relevant experience, not all of the employees had equal prior experience. For example, comparator Pennington had thirty years of experience in law enforcement, more than any of the complainants. These are important components of MIA’s mission, and expertise in these matters on the part of MIA employees is preferred. For each comparator, then, the salary assigned by MIA is explained by prior state experience, specialized credentials, other exceptional work experience, or a combination of these factors. Conticello’s salary was based on matching his prior salary after he laterally transferred into MIA, and is additionally justified by his Certified Fraud Examiner qualification. Xenos’s and Gross’s salaries were enhanced by their creditable prior state employment and their abovementioned specialized expertise. Comparators Hurley, Jacobs, and Pennington all had lower starting salaries than complainant Rogers, and they made more’than complainants Green and Cordaro based on the creditable prior state employment of Hurley and Jacobs, Hurley’s Certified Fraud Examiner qualification, and Pennington’s arson training .and lengthy law enforcement experience. Gender is not required to understand any of these decisions. These conclusions are further bolstered by looking to the salaries of other MIA employees. While the EEOC, identifies a number of men who were paid more than Cordaro, the lowest-paid complainant, it ignores the numerous examples of bien who were paid the same amount or less than she was paid. Michael Stefanowitz and Thomas Bradford were each hired at lower starting salaries than Cordaro’s. Todd Young, a Fraud Investigator at MIA, started prior to Cordaro, and with a higher starting salary. But his salary was later reduced by the same temporary salary reduction that affected Cordaro’s starting salary, so at the time she was hired, they had identical salaries. Following a reclassification of all Fraud Investigators to a higher compensation grade in 2013, Corda-ro’s compensation was identical to the male Fraud Investigators Williams Johns, Thomas Zanfardino, and Edward Spragg. And notably, the record indicates that the highest starting salary offered to any new Fraud Investigator during the relevant period was $51,809, an amount offered to both Mark Bilger, a man, and Novia Ma-duro, a woman. The overall salary history of the department, then, strengthens the impression given by examining only the complainants and comparators: MIA assigned salaries based on an individualized assessment of each new employee, not based on gender. ■ Given the large -number of individuals involved here and the variation in each individual’s background, it is easy to become focused on minutiae in this ■ case. When considered -together, though, the brushstrokes of each salary decision paint a clear picture of a state agency taking valid factors unrelated to gender into account when setting salaries. MIA 'necessarily took prior state employment into account: the comparators had more creditable state employment-'history than the complainants. MIA took expertise and relevant experience into account: the comparators had more credentials and relevant experience than the complainants. These straightforward explanations ' are more than sufficient to foreclose an EPA claim against the agency. The majority says the question is whether these explanations “in fact” explain the differentials as opposed to whether they “could.” Majority at 120. And the majority is certainly correct that discriminatory intent is not required in an EPA action. Id. at 119-20. But the explanations provided by the MIA do in fact explain the differentials in this case. Therefore, summary judgment in favor of MIA was appropriate in this case, even on the majority’s own terms. ■ m. I return briefly to where I began. The majority treats the state of Maryland as just any ole defendant, and that is not right. States are not mere abstract entities reserved for civics lectures. They discharge important tasks of governance and they house human heartbeats. The Framers made them a significant part of our constitutional architecture, which the majority has no right to dismantle. The majority has now allowed a federal agency possessed of no more than a transparently thin and insubstantial case to abrogate a state’s interest in managing its own workforce. It is foundational to both our civil and our .criminal justice systems that the ultimate burden resides with the party bringing suit. How much more must this be the case when the most basic ingredients of state autonomy are implicated. The. structure of our Constitution—adumbrated specifically in the Tenth Amendment but infused throughout that document— would seemingly require that pretrial dismissals be more, rather than less, available to state governments attempting to vindicate the place that the Constitution has assigned to them. The intrusion here is not justified by the evidence, under the law, or by the state’s weighty interest in managing its own employees. Requiring a federal agency to meet its ultimate burden here by clear and convincing evidence, not a mere preponderance, would seem one modest step in restoring the dignity of.our fifty states in the constitutional design. The clear and convincing standard allows the federal government to proceed in every case of real wrongdoing while deterring the assertion of federal authority in less-than-marginal instances such as this. Because the majority decision diminishes the rightful place of our states in every way conceivable or possible, I respectfully dissent. . In EPA cases, an employee alleging wage discrimination (a "complainant”) must show that her pay is lower than that of a fellow employee (a "comparator”) who performs "work substantially equal in skill, effort and responsibility under similar working conditions.” Strag v. Board of Trs., 55 F.3d 943, 948 (4th Cir. 1995). This case involves three complainants (Mary Jo Rogers, Marlene Green, and Alexandra Cordaro) and six comparators (Bruno Conticello, Jay Hurley, Donald Jacobs, Homer Pennington, Jeffrey Gross, and Maurice Xenos), The parties dispute whether Gross and Xenos are valid comparators, and neither the majority nor I decide this question. However, I address their qualifications to demonstrate that summary judgment is appropriate regardless.