<table>
<tr><td colspan="3" align="center">Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL IX</td></tr>
</table>

| JOSÉ RAMÓN PIMENTEL FERNÁNDEZ RUBIO<br><br>Recurrente<br><br>v.<br><br>DEPARTAMENTO DE EDUCACIÓN<br><br>Recurrido | TA2025RA00108 | *REVISIÓN ADMINISTRATIVA* procedente del Foro Administrativo de Educación Especial<br><br>Querella número: 2425-05-12-01083<br><br>Sobre: Educación Especial |
|---|---|---|

Panel integrado por su presidenta, la juez Brignoni Mártir, el juez Salgado Schwarz y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 25 de marzo de 2026.

Comparece el recurrente, José R. Pimentel Fernández-Rubio, representado por su padre, José N. Pimentel Vázquez y su madrastra, Mariela Prensa. Mediante el recurso de epígrafe, nos solicita la revocación de la *Resolución Final* emitida y notificada el 28 de junio de 2025, por una jueza administrativa del Departamento de Educación. En virtud del referido dictamen, la agencia declaró Ha Lugar una *Moción de Desestimación Por Insuficiencia de la Prueba ("NON SUIT")* presentada por el Departamento de Educación. En consecuencia, desestimó la *Querella* de epígrafe y concluyó que la propuesta de servicios presentada por el recurrente incumplía con el requisito de adecuacidad.

Por los fundamentos que expondremos a continuación revocamos la *Resolución Final* recurrida. En consecuencia, devolvemos el caso ante la consideración de la agencia recurrida, para la continuación de los procedimientos de manera cónsona con los pronunciamientos esbozados en la presente *Sentencia.*

**I**

Los hechos que suscitaron la controversia de epígrafe se remontan a una *Querella* presentada el 2 de mayo de 2022, ante el Departamento de Educación. Mediante la querella identificada con el número 2122-05-05-00880, se alegó la ilegalidad del egreso de José R. Pimentel Fernández-Rubio (el recurrente), sin haber cumplido con el derecho a compensación de servicios de transición post escolar acordados en años anteriores con el Departamento de Educación.

En síntesis, el recurrente, representado por su padre, José N. Pimentel Vázquez (Pimentel Vázquez), solicitó al Departamento de Educación que desarrollara e implementara un plan de acción dirigido de servicios compensatorios. El propósito de este plan sería subsanar los múltiples y continuos incumplimientos de la agencia recurrida en proveerle una educación pública, gratuita y apropiada (en adelante, FAPE, por sus siglas en inglés, las cuales corresponden a "*free appropriate public education*"). Ello, con el propósito de colocarle en la posición de progreso académico y funcional que habría tenido, de haber recibido FAPE. Finalmente, el recurrente solicitó que el referido plan tuviese una duración mínima de dos (2) años, que podrían extenderse a cinco (5). Durante este período, debía mediar una enseñanza en escenarios concretos donde este pudiera adquirir y comprender los conceptos y destrezas necesarias para una mayor independencia e integración social necesaria.

Mediante una *Resolución Final y Orden* emitida el 16 de septiembre de 2024, la agencia adjudicó la Querella núm. 2122-05-05-00880 y la declaró Ha Lugar. Como resultado, le ordenó al Departamento de Educación a desarrollar e implementar un plan de servicios compensatorios de transición post escolar 'con el propósito de subsanar los múltiples y continuos incumplimientos de la agencia querellada en proveerle FAPE al joven querellante'. Según el

referido dictamen, este plan de servicios tendría el propósito de colocar al recurrente en la posición de progreso académico y funcional que habría tenido, si hubiera recibido FAPE.[1]

Asimismo, dicha *Resolución Final y Orden* dispuso expresamente que el plan de servicios que el Departamento de Educación estaba obligado a proveerle al recurrente debía tener una duración mínima de dos (2) años, que podría extenderse a cinco (5). Asimismo, estableció que, como parte del plan, debía mediar una enseñanza en escenarios concretos que le posibilitaran al recurrente adquirir destrezas, así como comprender los conceptos requeridos para una mayor independencia e integración social necesarias.[2] De este modo, en la *Resolución Final y Orden* se dispuso lo siguiente:

> Entre los programas terapéuticos que se deben considerar como parte de estos servicios compensatorios se encuentran el entrenamiento en destrezas centrales (PRT) y la terapia del diario vivir (Método Higashi). **Siendo esta la forma apropiada en que el querellante podrá alcanzar el progreso razonable que hubiera recibido si el Departamento de Educación le hubiera provisto FAPE y poder superar los rezagos provocados por la falta de ofrecimiento de FAPE.**[3] (Negrillas suplidas).

Acto seguido, el 28 de septiembre de 2024, los padres del recurrente, por conducto de su abogado, cursaron un correo electrónico al Departamento de Educación. Mediante este, solicitaron que se diera cumplimiento a la *Resolución Final y Orden* del 16 de septiembre de 2024.[4] Específicamente, requirieron al Departamento de Educación convocar y celebrar una reunión del Comité de Programación y Ubicación (COMPU), con el propósito de desarrollar e implementar un plan de transición ordenado y expresaron su disponibilidad para asistir a dicha reunión. De igual forma, se advirtió a la agencia recurrida que, si incumplía con

---

[1] *Véase* págs. 4-5 de la *Resolución Final y Orden* de 16 de septiembre de 2024, emitida en la querella núm. 2122-0505-00880.
[2] *Íd.*
[3] *Íd.*, pág. 5.
[4] Emitida en la querella núm. 2122-05-05-00880. *Véase* Correo electrónico enviado por el recurrente en el mes de septiembre de 2024, anejo 2 del Recurso de Revisión.

convocar la reunión y realizar un ofrecimiento de ubicación apropiado en el término dispuesto en ley, procederían a ubicar al recurrente en una institución privada, a costo público.[5] En la referida comunicación, Pimentel Vázquez solicitó lo siguiente:

> **Hasta el momento de la redacción y envío de esta comunicación, la agencia recurrida está incumpliendo con lo ordenado. Se advierte que los padres solicitarán tiempo compensatorio desde el momento en que se dictó la Resolución y hasta que se provea una ubicación apropiada para el estudiante y que cumpla con lo ordenado en la Resolución antes citada**. Ante el claro incumplimiento de la agencia con proveer FAPE y una ubicación apropiada para el estudiante en el sector público, los padres notifican que matricularán a su hijo en ubicación privada a costo público. **Se solicita que la agencia, en el término dispuesto en ley cumpla con ofrecer una ubicación apropiada para el estudiante.**
>
> Los padres del estudiante tienen disponible cualquier día y hora dentro del término dispuesto en ley para atender y comparecer a una reunión del COMPU adecuadamente constituido. Advertimos que la composición del COMPU debe incluir a los siguientes funcionarios:
>
> 1. Directora escolar
> 2. Maestra de educación especial
> 3. Consejero en rehabilitación
> 4. Fotógrafo profesional
> 5. Los terapistas que proveen servicios al estudiante.
> 6. Un representante de la agencia con conocimiento del currículo y los recursos de la agencia y autoridad para hacer un ofrecimiento de ubicación pública y apropiada.
>
> Es de suma importancia que si algún miembro desea participar a través de documento escrito (participación alterna) se entregue su participación con suficiente tiempo antes de la reunión (3 días laborables) para que los padres determinen si aceptarán la participación alterna. No se excusará a ningún miembro para el que con anticipación no se reciba su participación alterna. **También es necesario que dentro del mismo término se haga entrega del PEI de transición que la agencia propone se implemente para cumplir con la compensación de servicios del estudiante. No recibir la propuesta de PEI con suficiente tiempo impedirá la participación efectiva de los padres en el proceso**.[6]

(Negrillas suplidas).

Sin embargo, la *Resolución Final y Orden* de 16 de septiembre de 2024,[7] advino final y firme sin que el Departamento de Educación presentara oportunamente a los padres del recurrente el plan de

---

[5] *Íd.*
[6] *Íd.*
[7] En la querella núm. 2122-05-05-00880.

transición post secundario allí ordenado.[8] El Departamento de Educación tampoco respondió a la solicitud de los padres para convocar la reunión de COMPU requerida para hacer un ofrecimiento de ubicación apropiado.[9]

Así las cosas, en diciembre de 2024, sin haber recibido una propuesta del Departamento de Educación, Pimentel Vázquez contrató los servicios de S.E.R.A. Consultants (S.E.R.A.). Ello, con el propósito de que esta le proveyese al recurrente los servicios de transición post escolar en el área de fotografía, ordenados en la *Resolución Final y Orden* de 16 de septiembre de 2024.[10]

Acto seguido, el 6 de diciembre de 2024, y sin haber recibido respuesta a su solicitud, el recurrente, representado por Pimentel Vázquez, presentó la *Querella* de epígrafe.[11] Ello, al amparo de la Ley Federal *Individual with Disabilities Education Act*, 20 U.S.C. Sec.1400 *et seq.* (En adelante, Ley IDEA). En esta, solicitó la compra de servicios de transición post secundaria por dos (2) años en S.E.R.A. En síntesis, solicitó servicios educativos y suplementarios para el año académico 2024-2025 y los subsiguientes, así como el reembolso de los pagos realizados por los padres a S.E.R.A. y prospectivamente de forma directa a la institución.

El 16 de diciembre de 2024, el Departamento de Educación presentó una *Contestación a Querella.* En síntesis, sostuvo que, para el año escolar 2024-2025, el recurrente se encontraba ubicado en la escuela Papa Juan XXIII, con el propósito de recibir servicios conducentes a transición, pues ya cuenta con diploma. Así también, que su último Programa Educativo Individualizado (PEI) corresponde al año escolar 2019-2020.

---

[8] *Véase* Testimonio del recurrente, pág. 59, líneas 7-11 de la Transcripción de la Prueba Oral (TPO).

[9] *Véase* Testimonio incontrovertido del recurrente, pág. 81, líneas 7-8 de la TPO.

[10] *Véase* Testimonio del recurrente, pág. 81, líneas 21-25 y pág. 82, líneas 1-3 de la TPO.

[11] *Véase* Anejo 3 del Recurso de Revisión.

Sobre la solicitud de reembolso de las sumas pagadas en el mercado privado, el Departamento de Educación expuso que la parte querellante tiene el peso de la prueba, a los fines de demostrar que el Departamento de Educación incumplió con lo establecido en la Ley IDEA y/o a las estipulaciones del caso *Rosa Lydia Vélez v. DEPR*.[12] De igual forma, señaló que, de esta probar que procedía el reembolso, tendría que demostrar también que el servicio procedía, mediante el desglose y la evidencia de los pagos realizados, ya que la ubicación fue unilateral. En lo pertinente a la compensación de los servicios, el Departamento de Educación señaló que es cosa juzgada, debido a que fue previamente adjudicado.[13]

El 14 de enero de 2025, la agencia recurrida celebró una vista sobre el estado de los procedimientos.[14] Durante esta, el Departamento de Educación informó que se realizaría una recomendación legal a la Secretaría Asociada de Educación Especial (SAEE) sobre la compra de servicios solicitada y que informaría al recurrente los resultados de la consulta, en o antes del 19 de febrero de 2025. Así también, la agencia señaló la vista en su fondo para el 27 de febrero de 2025 y extendió los términos para emitir la *Resolución Final* de la querella hasta el 22 de marzo de 2025.[15]

En el interín, el 20 de enero de 2025, los padres del recurrente pagaron la matrícula inicial a S.E.R.A., para que pudiera comenzar a recibir los servicios de transición ordenados en la *Resolución Final* y *Orden* de 16 de septiembre de 2024.[16] Entre el 20 de enero de 2025 y el 14 de marzo de ese año, este recibió dichos servicios.[17]

---

[12] Caso núm. K PE80-1738.
[13] En la querella núm. 2122-05-05-00880.
[14] *Véase Minuta de Vista Sobre el Estado de los Procedimientos, Vista en su Fondo y Extensión de los Términos*, notificada el 16 de febrero de 2025. Anejo 5 del Recurso de Revisión.
[15] *Íd.*
[16] *Véase* Testimonio del recurrente, pág. 119, líneas 12-23 de la TPO.
[17] Testimonio del recurrente, pág. 122, línea 10, hasta pág. 125, línea 7 de la TPO. Véase, además, Testimonio de la Dra. Carmen Santiago, pág. 197, línea 3, hasta pág. 198, línea 22 de la TPO.

El 19 de febrero de 2025, el representante legal del Departamento de Educación presentó una *Moción en Cumplimiento de Orden y Solicitando Orden de COMPU*. Mediante esta, solicitó el desarrollo de un PEI.[18]

En desacuerdo, el 20 de febrero de 2025, el recurrente presentó una *Moción Urgente en Oposición de Conversión de Vista y Solicitando Grabación de Vista de 14 de Enero*.[19] Allí, expuso el tracto procesal del caso desde que se emitió la *Resolución Final y Orden* de 16 de septiembre de 2024[20] y advirtió que esta advino final y firme sin acción alguna del Departamento de Educación.[21] Enfatizó, además, que, inmediatamente después de notificado el aludido dictamen final, solicitó una reunión de COMPU mediante correo electrónico, sin que el Departamento de Educación actuara. Asimismo, que, ante la ignorancia de la solicitud de los padres de convocar un COMPU para la discusión del PEI y la ausencia de algún ofrecimiento de ubicación pública, matricularon al estudiante en una ubicación privada, idéntica a la propuesta que existía desde el 2024.[22]

El recurrente expuso también que se oponía a la conversión de la vista y que la solicitud de reunión de COMPU, a esas alturas, constituía una táctica dilatoria del Departamento de Educación para evitar el pago de la ubicación que seleccionó, ante su falta de ofrecimiento.[23] Asimismo, destacó que la agencia recurrida tuvo oportunidad de convocar y celebrar el COMPU desde septiembre de 2024 y no lo hizo, por lo que ya no podría realizar un ofrecimiento de ubicación oportuno.[24] Así, tras varios incidentes procesales, el 18 de marzo de 2025, el Departamento de Educación sometió

---

[18] *Véase* anejo 6 del Recurso de Revisión.
[19] *Véase* anejo 7 del Recurso de Revisión.
[20] En la querella núm. 2122-05-05-00880.
[21] *Véase* anejo 7 del Recurso de Revisión.
[22] *Íd.*
[23] *Íd.*
[24] *Íd.*

finalmente su propuesta para el plan de transición ordenado en la *Resolución Final y Orden* de 16 de septiembre de 2024.[25]

Posteriormente, el 25 de marzo de 2025, se celebró la reunión de COMPU y allí el Departamento de Educación presentó su plan de transición. Al culminar la reunión, las partes acudieron al local donde ubica S.E.R.A. Allí, llevaron a cabo una inspección ocular de las instalaciones.

Así las cosas, el 16 de abril de 2025, el recurrente envió un correo electrónico con la propuesta de servicios de transición post secundaria revisada. Esta comunicación incluyó un desglose de los materiales y equipo de Asistencia Tecnológica, así como su costo.[26]

El 5 de mayo de 2025, el COMPU se reunió a los fines de discutir la propuesta enmendada de S.E.R.A. El recurrente entregó la propuesta al Departamento de Educación, pero no firmó el plan de servicios o la minuta de la reunión.[27]

Acto seguido, el 14 de mayo de 2025, la agencia recurrida cursó un correo electrónico al recurrente, en el que le comunicó su rechazo a la propuesta de S.E.R.A. para la compra de servicios.[28] En igual fecha, el Departamento de Educación remitió una propuesta de servicios preparada por Consejería de Salud Integral Inc. (Salud Integral), quien figura como contratista de la agencia recurrida.[29]

El 15 de mayo de 2025, el recurrente presentó una *Moción de Prueba Enmendada*. Entre la prueba incluida, figuran los *Curriculum Vitae* del Dr. Ernesto Pérez Cartagena (doctor Pérez Cartagena), fundador de S.E.R.A., de la Dra. Carmen Santiago Santiago (doctora Santiago), gerente de operaciones de S.E.R.A. y directora de proyecto, y de Rafael Ramírez Santiago, fotógrafo

---

[25] En la querella núm. 2122-05-05-00880.
[26] *Véase* anejo 10 y 11 del Recurso de Revisión.
[27] *Véase* anejo 13 del Recurso de Revisión y entrada núm. 5 de SUMAC TA.
[28] *Véase* anejo 14 del Recurso de Revisión.
[29] *Véase* anejos 15 y 16 del Recurso de Revisión.

profesional que imparte capacitación en S.E.R.A., así como el Informe de Evaluación y Análisis diagnóstico de fotografía.

Así las cosas, el 22 de mayo de 2025, comenzó la celebración de la vista en su fondo, la cual se realizó en modalidad virtual. Durante esta, prestaron testimonio Pimentel Vázquez, así como la doctora Santiago y el doctor Pérez Cartagena, de S.E.R.A. El recurrente presentó, además, su prueba documental. Toda vez que faltaba el desfile de prueba del Departamento de Educación, la continuación de la vista administrativa quedó señalada para el 12 de junio de 2025.[30]

Por su parte, Pimentel Vázquez declaró que, tanto la propuesta original de servicios de transición postsecundaria como la enmendada, contaron con la participación de los padres. Ello, a los fines de identificar, para beneficio de S.E.R.A., las fortalezas y necesidades del recurrente. Ello, de modo que estos elementos fuesen considerados en la propuesta de servicios. Asimismo, le proveyeron a S.E.R.A. acceso al expediente del recurrente, para la preparación de la propuesta.[31]

En cuanto a las cualificaciones de la doctora Santiago, destaca que esta posee un bachillerato en Psicología y Educación Especial, una maestría en Administración y Supervisión Escolar, y un doctorado en Administración de Programas de Educación Especial. Así también, cuenta con varias certificaciones adicionales emitidas por el Departamento de Educación y se ha desempeñado como maestra de educación especial, directora escolar y superintendente auxiliar para dicha agencia.[32]

En lo pertinente a la adecuacidad de la ubicación privada propuesta, el testimonio de la doctora Santiago consistió en afirmar

---

[30] *Véase* anejo 17 del Recurso de Revisión.
[31] *Véase* págs. 142-143 de la TPO.
[32] *Véase* pág. 163 de la TPO.

que la propuesta de servicios de transición postsecundaria enmendada para el recurrente, preparada por S.E.R.A., estuvo basada en el resultado de las evaluaciones que se le realizaron entre el 20 de enero y 14 de marzo de 2025. En específico, incluyó metas y objetivos para las cinco (5) áreas siguientes: vocacional funcional en fotografía, lenguaje y matemáticas funcionales alineadas a las destrezas de fotografía. Asimismo, incluye adiestramiento de trabajo, consistente en destrezas de empleo en escenarios reales y destrezas de vida independiente, según las necesidades identificadas en el Sistema de Evaluación de Transición Escolar a Nivel Secundario (conocido comúnmente por sus siglas, SETENS).[33] La doctora Santiago afirmó que el equipo de trabajo de S.E.R.A., a cargo de implementar las destrezas incluidas en la propuesta, se compone de un fotógrafo profesional, una maestra de educación especial, una directora, un consejero vocacional y los padres.[34]

Mediante su testimonio, la doctora Santiago también expresó que la propuesta de servicios de transición postsecundaria de S.E.R.A. incluyó el costo de equipos de asistencia tecnológica y equipos de fotografía adaptados para el estudiante, cuyo costo asciende a $23,400.00.[35] Esta afirmó que los equipos de asistencia tecnológica recomendados por la agencia estaban obsoletos y que se propuso sustituirlos por una tableta IPad que cubría las necesidades del estudiante.[36] La testigo aseguró que la matrícula incluida en la propuesta de servicios de transición post secundaria de S.E.R.A. incluyó el costo de los equipos de asistencia tecnológica, equipos de fotografía para el estudiante, equipos y materiales adicionales para fotocopias y servicios de transportación. Asimismo,

---

[33] *Véase* Testimonio de la Dra. Carmen Santiago, pág. 167, líneas 4-13; pág. 168, líneas 11-15; págs. 169-172 de la TPO.

[34] *Véase* Testimonio de la Dra. Carmen Santiago, pág. 168, líneas 2-6; pág. 212, línea 19 hasta pág. 213, línea 19 de la TPO.

[35] *Íd.*, pág. 178, líneas 14-18; pág. 196, líneas 12-25 y pág. 222, líneas 21-25 de la TPO.

[36] *Íd.*, pág. 174, línea 17, hasta pág. 175, línea 2; pág. 219, línea 23 de la TPO.

que el fotógrafo que trabajará las destrezas de fotografía contaba con un equipo profesional y que era el recurrente quien no contaba con equipo adaptado.[37]

Por su parte, el doctor Pérez Cartagena, fundador y presidente de S.E.R.A., declaró que la entidad fue creada en el 2009 por diversos profesionales, con el propósito de ofrecer servicios en el área de educación y rehabilitación, realizar evaluaciones, proveer consultoría y elaborar proyectos de transición. Sobre la propuesta, el doctor Pérez Cartagena expresó que esta fue diseñada por S.E.R.A. para proveer capacitación de pre-empleo vocacional en el área de fotografía y que se esperaba que, con ello, el recurrente lograra adquirir las destrezas de fotografía, dentro de su capacidad.[38]

El 11 de junio de 2025, el Departamento de Educación presentó una *Moción de Desestimación Por Insuficiencia de la Prueba ("NON SUIT").*[39] Entre otros asuntos, sostuvo que, al momento, no existía un plan de servicios para la transición acordado por las partes. Asimismo, que, conforme al caso *Schaffer v. Weast*, 546 US 49 (2005), el peso de la prueba recaía sobre la parte querellante. Al respecto, señaló que quien solicita la compra de servicios debe probar: (1) que hay un Plan de Transición para brindar FAPE; (2) que la escuela privada es adecuada y, (3) que se siguieron los procedimientos legales.[40]

En la solicitud de desestimación, el Departamento de Educación también exhortó a la jueza administrativa a tomar conocimiento judicial de la *Resolución Final y Orden* emitida el 16 de septiembre de 2024.[41] Asimismo, argumentó que el recurrente falló en establecer un Plan de Transición para brindar FAPE. Consideró

---

[37] *Íd.*, pág. 221-224 de la TPO.
[38] *Véase* págs. 265-267 de la de la TPO.
[39] *Véase* anejo 18 del Recurso de Revisión.
[40] *Íd.*
[41] En la querella núm. 2122-05-05-00880. Véase *Íd.*

también que, del testimonio de Pimentel Vázquez surge que su hijo no cuenta con un PEI y que no firmó el plan desarrollado por el COMPU en las reuniones de 25 de marzo y 5 de mayo de 2025. De igual forma, el Departamento de Educación señaló que el recurrente tampoco estableció la *adecuacidad* de la compra de servicios.[42]

En consideración a la presentación de la moción de *non suit* por parte del Departamento de Educación, ese mismo día, la agencia recurrida dejó sin efecto el señalamiento de continuación de vista pautado para el 12 de junio de 2025. Por su parte, el 11 de junio de 2025, el recurrente presentó una *Escrito en Oposición a Moción de Desestimación por Insuficiencia de Prueba* ("NON SUIT").

Mediante dicha comparecencia escrita, el recurrente arguyó que, en septiembre de 2024, sus padres solicitaron el cumplimiento de la *Resolución* de 16 de septiembre de 2024. Asimismo, que, al persistir la agencia en su incumplimiento, notificaron matrícula privada conforme a la sección 1412(a)(10)(C)(ii) de IDEA y 34 C.F.R. sec. 300.148(d). Ello, toda vez que el Departamento de Educación no respondió la notificación, ni convocó al COMPU dentro del término legal, lo cual implicó una renuncia tácita a su deber de ofrecer ubicación y un PEI.

En esencia, el recurrente sostuvo que, conceder la desestimación en este caso, no solo avalaría los reiterados incumplimientos de la agencia recurrida, sino que es contraria al propósito fundamental de la Ley IDEA. Entiéndase, asegurar que los estudiantes con discapacidades reciban FAPE.[43] Arguyó también que, desestimar la querella, le dejaría desprovisto de todo remedio legal efectivo y convertiría el proceso administrativo en un formalismo que legitima la inacción institucional.[44]

---

[42] *Véase* anejo 18 del Recurso de Revisión.
[43] *Íd.*
[44] *Íd.*

En su escrito de oposición, el recurrente también invocó la doctrina del caso *Schaffer v. Weast,* supra, págs. 57-59. Este dispone que, si bien el peso de la prueba en la vista administrativa la tiene quien solicita el remedio, cuando la agencia incumple sus deberes, puede perder el caso. Además, advirtió que la propuesta presentada por la agencia cinco (5) días antes de la vista y firmada por una funcionaria de Salud Integral, constituía una violación a FERPA, 20 U.S.C. sec. 1232g, la cual prohíbe la divulgación de expedientes sin el consentimiento escrito de los padres. Por su parte, el Departamento de Educación presentó una *Réplica,* en la que reiteró que el peso de la prueba recaía en el recurrente.

Tras solicitarle a la agencia recurrida un término breve para comparecer nuevamente, el 18 de junio de 2025, el recurrente presentó una *Moción en Oposición de Desestimación y Solicitando Continuidad de Vista.*[45] En esta, además de reiterar los argumentos esbozados en su oposición, realizó un recuento de los hechos procesales y de la prueba desfilada. Como remedio, solicitó del foro administrativo la denegatoria de la moción de *non suit* y la continuación del desfile de prueba, a los fines de que se le permita al Departamento de Educación presentar su prueba. Por estar en desacuerdo, el 19 de junio de 2025, el Departamento de Educación presentó una *Moción Objetando Prueba Adicional No presentada durante la Vista Administrativa y Reiterando Non -Suit.*

Finalmente, el 28 de junio de 2025, el Departamento de Educación emitió la *Resolución Final* recurrida. Mediante esta declaró Ha Lugar la moción de *non suit* instada por el Departamento de Educación. En consecuencia, desestimó la *Querella* de epígrafe. Como fundamento, sostuvo que la prueba presentada por el recurrente resultó *insuficiente* para establecer la adecuacidad de la

---

[45] *Véase* anejo 19 del Recurso de Revisión.

propuesta de servicios de la ubicación privada que su padre seleccionó. En el dictamen recurrido, la agencia determinó probados los hechos siguientes:

DETERMINACIONES DE HECHOS

El 22 de mayo de 2025 celebramos la vista administrativa. La parte querellante presentó la prueba documental y testifical, y la querella quedó sometida. El 2 de junio de 2025 se ordenó la continuidad de vista para el 12 de junio de 2025 para la presentación de la prueba [de la] querellada. El 11 de junio de 2025 la parte querellada presentó solicitud de desestimación por insuficiencia de prueba. El 11 de junio de 2025 la parte querellante presentó objeción a desestimación.

El 11 de junio de 2025 emitimos una notificación indicando que la parte querellante había concluido con su desfile de prueba y había sometido la querella y la misma estaba sometida para adjudicación final. La continuación de la vista administrativa no fue suspendida. Se indicó en la notificación emitida que nos correspondía determinar la adecuacidad de la ubicación propuesta. El 11 de junio de 2025 la parte querellada presentó Réplica a oposición.

El 12 de junio de 2025 la parte compareciente solicitó un breve término para presentar su postura sobre desestimación y la necesidad de señalar el caso para culminar [el] desfile de prueba. Obviamente, el peso de la prueba es de la parte querellante y no de la parte querellada.

El 2 de mayo de 2022, la parte querellante presentó el caso QEE-2122-050-05-00880, en el cual las partes acordaron que, el estudiante recibiría dos (2) años de compensación en transición. En febrero de 2024, la ubicación propuesta elaboró una propuesta de servicios de transición para el estudiante, la cual fue presentada al DEPR durante el trámite del caso QEE-2122-050-05-00880, sin ser discutida en reunión de COMPU.

El 16 de septiembre de 2024, emitimos una Resolución en la querella QEE-2122-050-05-00880, ordenando al DEPR desarrollar e implementar un plan de acción para proveer servicios compensatorios al estudiante por un período de dos (2) años.

El 28 de septiembre de 2024, el Lcdo. Israel Medina informó por correo electrónico a la Lcda. Cristina Abella que el estudiante querellante sería matriculado en una escuela privada con fondos públicos. La parte querellante indicó que, era debido al incumplimiento de la Agencia en revisar el PEl 2024-2025 y ofrecer una alternativa de ubicación apropiada en el sector público.

El 6 de diciembre de 2024, la parte querellante presentó la querella de epígrafe, solicitando la compra [...] de los servicios de transición mediante una corporación conforme a la propuesta previamente sometida en el caso QEE-2122-050-05-00880. El estudiante fue retirado, donde estaba matriculado. El 11 de diciembre de 2025, sus padres acudieron al plantel para recoger sus materiales y el equipo de asistencia tecnológica.

A inicios de diciembre de 2024, el estudiante fue matriculado en una academia de transición. En enero de 2025, los padres pagaron $2,000.00 a la academia de transición como concepto de matrícula para que el estudiante pudiera comenzar a recibir servicios.

En enero de 2025, fue evaluado por un fotógrafo, una maestra de educación especial, la directora de la ubicación propuesta y el perito. Se preparó un Informe de logros alcanzados del estudiante del periodo del 20 de enero al 14 de marzo de 2025. El 16 de abril de 2025 el representante legal de los padres remitió a la agencia una propuesta enmendada con los costos y notificando propuesta y costos.

El 5 de mayo de 2025 se reunió el COMPU con el propósito de discutir la propuesta enmendada y entregó a la agencia el desglose de equipo de fotografía y de asistencia tecnológica que se incluyó en la propuesta enmendada. La minuta del 5 de mayo de 2025, al igual que el Plan de transición elaborado por el COMPU, no habían sido firmados.

El 14 de mayo de 2025, el DEPR notificó su decisión de no autorizar la adquisición de servicios según solicitados. El 14 de mayo de 2025, el DEPR presentó una propuesta elaborada conforme al Plan de Transición del COMPU, para integrar al estudiante a un Programa de Transición y Fotografía que fue objetada por la parte querellante.

La propuesta de servicios de transición presentada por la parte querellante fue preparada por la directora en conjunto con la maestra de español, el fotógrafo y los padres del estudiante. El perito colaboró en el área de consejería y transición y no participó en la preparación de la propuesta enmendada. La propuesta no fue autorizada por el DEPR ni por el COMPU. La propuesta contempla un periodo de ejecución de dos (2) años.

El 16 de septiembre de 2024 emitimos la Resolución Final en la querella QEE: 2122-05-05-00880. En la misma se ordenó desarrollar un plan de servicios compensatorios de transición post escolar para el estudiante fue marcado Exhibit 1. de las partes. La de propuesta [de] servicios educativos privados de la parte querellante en la presente querella fue marcada como el Exhibit 2 de las partes.

Sobre la prueba documental presentada, la agencia recurrida advirtió que las partes presentaron, de manera conjunta, siete (7) piezas de prueba documental. Como parte de estas, se incluyó la *Resolución Final y Orden* de 16 de septiembre de 2024.[46]

De igual forma, el foro administrativo estableció la ausencia de controversias sobre las condiciones y los diagnósticos del recurrente. En síntesis, la agencia razonó que la localización propuesta incumplía con los requisitos mínimos para considerarse apropiada, conforme a la Ley IDEA. De manera cónsona, sostuvo que, a su entender, dicha ubicación no cuenta con una estructura apropiada para recibir al recurrente.

Igualmente, el foro administrativo concluyó que el testimonio de la doctora Santiago no logró demostrar que S.E.R.A. tuviera disponible personal capacitado para ejecutar los componentes educativos requeridos, debido a que dependía de contrataciones o planes futuros aun no concretados. Asimismo, concluyó que la ubicación propuesta presentó costos excesivamente elevados. En esos términos, la agencia recalcó en el dictamen recurrido que la ubicación propuesta promueve un modelo aún en diseño, sin garantías de ejecución inmediata. Ello, a su juicio, podría generar retrasos sustanciales en la prestación de servicios esenciales.

De otra parte, la agencia recurrida también razonó que no existe un plan de transición para el recurrente, autorizado por una reunión de COMPU, en el que se contemplen los servicios de transición post secundaria propuestos y desarrollados sin la participación y consulta del Departamento de Educación. En ese contexto, coligió que la localización no es apropiada, ya que no sería capaz de implementar un PEI desde su inicio debido a que está en proceso de desarrollo.

---

[46] En la querella núm. 2122-05-05-00880.

En lo pertinente, la agencia añadió que el gasto propuesto excede lo razonable, "no por el costo en sí", sino porque está en proceso de construir un programa y no hay certeza de ejecución, ni de duración. Concluyó que el programa no está disponible en la realidad, que los fondos públicos serían para atender al recurrente en el futuro, que la ubicación propuesta por este crearía y operaría el programa de fotografía, si la agencia autorizaba la compra de servicios, y que S.E.R.A. no está capacitado para sostener la prestación de servicios de forma continua, adecuada y apropiada.

Finalmente, la agencia recurrida consideró que la solicitud de compra de servicios no constituye una ubicación adecuada. Ello, por carecer de elementos sustantivos y operacionales para implementar el plan de transición post secundaria del recurrente. Asimismo, que incumple con los requisitos jurisprudenciales y reglamentarios. Como parte del razonamiento esbozado, la agencia destacó que el COMPU se reunió por primera vez el 25 de marzo de 2025, a solicitud del Departamento de Educación. Expresó también preocupación ante el hecho de que el recurrente no utilizó los mecanismos procesales disponibles para instar a la aprobación de un plan de transición post secundario y que, por el contrario, optó por solicitar directamente una ubicación privada que no resulta adecuada. Finalmente, la agencia recurrida avaló el que el Departamento de Educación compartiera información sobre el recurrente con Salud Integral, que es uno de sus contratistas, a los fines de preparar este plan.

Inconforme, el 27 de julio de 2025, el recurrente presentó el recurso de epígrafe y señaló la comisión de los siguientes errores:

> Erró el foro administrativo al adoptar determinaciones sin base en el récord o prueba admisible.

> Erró el foro administrativo al desestimar la acción aplicando un estándar de adecuacidad mayor al reconocido jurisprudencialmente en *Rowley* y *Florence County.*

Erró el foro administrativo al declarar prematura la controversia sobre ubicación privada[,] por ausencia de plan aprobado en COMPU.

Erró el foro administrativo en la apreciación de la prueba desfilada[,] mostrando parcialidad y error manifiesto.

El 8 de enero de 2026, tras el Departamento de Educación presentar una *Transcripción de la Regrabación Suministrada* correspondiente a la vista administrativa virtual del 22 de mayo de 2025,[47] el recurrente presentó un *Alegato Suplementario*. En esencia, detalló aspectos de la prueba oral desfilada que, a su juicio, son relevantes a los fines de establecer la adecuacidad de la ubicación privada propuesta.

Por su parte, el 9 de febrero de 2025, el Departamento de Educación presentó un *Escrito en Cumplimiento de Resolución*. En resumen, argumentó que el recurrente no satisfizo su carga probatoria.

Evaluados los escritos de las partes con sus respectivos anejos, el expediente administrativo y la *Transcripción de la Regrabación Suministrada,* estamos en posición de resolver.

**II**

**A**

Sabido es que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que cuentan con vasta experiencia y pericia para atender aquellos asuntos que la Asamblea Legislativa les ha delegado. *Otero Rivera v. USAA Fed. Savs. Bank*, 214 DPR 473, 484 (2024); *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99, 114 (2023); *OEG v. Martínez Giraud*, 210 DPR 79, 116-117 (2022). Es por ello, que tales determinaciones gozan de una presunción de legalidad y corrección que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente

---

[47] El Departamento de Educación presentó la TPO el 14 de noviembre de 2025. Entrada núm. 12 del caso núm. TA2025RA00108 en el SUMAC TA.

para derrotarlas. *Transp. Sonnell, v. Jta. Subastas ACT*, 214 DPR 633, 648 (2024); *Otero Rivera v. USAA Fed. Savs. Bank*, supra, pág. 484; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 215-216 (2012).

No obstante, la norma antes reseñada tampoco es absoluta. Al respecto, el Tribunal Supremo ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 743, 754 (2024).

En *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial. Sobre el particular, detalló lo siguiente:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. [Cita omitida] Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida.

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud*, supra, pág. 89; *Super Asphalt v. AFI y otro*, 206 DPR 803, 820 (2021); *Graciani Rodríguez v. Garage Isla Verde*, 202 DPR 117, 127 (2019); *Torres Rivera v. Policía de PR*, supra, pág. 626. Bajo este criterio, la revisión judicial se limita a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *OEG v. Martínez Giraud*, supra.

Bajo este supuesto, la sección 4.5 de la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, Ley Núm. 38-2017, 3 LPRA sec. 9675 (LPAU), estableció "el marco rector aplicable a la revisión judicial de las determinaciones de las agencias administrativas". *Otero Rivera v. USAA Fed. Savs. Bank*, supra, pág. 484; *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). De este modo, la intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hechos que la agencia realizó están sostenidas por la evidencia sustancial que obra en el expediente administrativo, visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Katiria's Café, Inc. v. Municipio Autónomo de San Juan*, res. el 27 de marzo de 2025, 2025 TSPR 33, citando a *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012); *Rolón Martínez v. Supte. Policía*, supra, págs. 35-36.

Por otro lado, las conclusiones de derecho pueden ser revisadas en su totalidad. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675; *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Torres Rivera v. Policía de PR*, supra, pág. 627. No obstante, los tribunales deberán dar peso y deferencia a las interpretaciones que la agencia realice respecto a aquellas leyes y reglamentos que administra. *Rolón Martínez v. Supte. Policía*, supra.

En fin, el Tribunal Supremo ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales". *Torres Rivera v. Policía de PR*, supra, págs. 627-628; *OEG v. Martínez Giraud*, supra, pág. 90.

De este modo, el Alto Foro ha expresado que el criterio administrativo no podrá prevalecer en aquellas instancias en que la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, considera que "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia". *OEG v. Martínez Giraud,* supra, pág. 91.

**B**

El Artículo II, sección 5 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1, ed. 1982, pág. 271, dispone, en lo pertinente:

> Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria.

Es decir, que, en Puerto Rico, el derecho a la educación tiene rango constitucional. *Declet Ríos v. Depto. de Educación,* 177 DPR 765, 773 (2009); *Orraca López v. ELA,* 192 DPR 31, 40 (2014). El propósito principal de la cláusula es definir las aspiraciones colectivas sobre la educación y crear un sistema de enseñanza pública a niveles primario y secundario, exclusivamente. El lenguaje utilizado en el citado artículo y el claro historial de esta disposición en la Convención Constituyente indican, sin lugar a duda, que el derecho a la educación allí reconocido se limita a la educación a niveles primarios y está sujeto a que el Estado tenga los recursos necesarios para su implantación. *Asoc. Academias y Col. Cristianos*

*v. E.L.A.,* 135 DPR 150, 168-169 (1994); *Orraca López v. ELA*, supra, pág. 41.

Sobre esos extremos, en *Bonilla v. Chardón,* 118 DPR 599, 605-606 (1978), nuestro más Alto Foro destacó lo siguiente:

> Aunque por muchos siglos las sociedades han marginado, discriminado y estigmatizado a las personas con impedimentos físicos, en las últimas dos décadas el estado moderno ha tomado medidas afirmativas para incorporarlas a la comunidad. Entre los cambios más notables se destaca el reconocimiento de su derecho a recibir y reclamar judicialmente educación remedial. (Citas omitidas).

Posteriormente, se aprobó la Ley Núm. 21 de 22 de julio de 1977, según enmendada, 18 LPRA sec. 1331 *et seq.*,[48] que utilizó como modelo la entonces vigente Ley Federal de Educación Especial, Ley Púb. Núm. 94-142,[49] de 29 de noviembre de 1975 (89 Stat. 773), conocida en inglés como *Education for All Handicapped Children Act of 1975.* Véase, *Declet Ríos v. Depto. de Educación,* supra, pág. 774, citando a *Bonilla v. Chardón,* supra. Ambas leyes, la federal y la estatal, reconocieron el derecho de los niños con impedimentos físicos a tener acceso al sistema de educación pública, mediante un plan de enseñanza individualizado que atendiera sus necesidades. *Íd.*

Mas tarde, en 1990 el Congreso de los Estados Unidos aprobó la ley conocida como *Individuals with Disabilities Education Act* (IDEA). En 2004, la ley federal conocida como *Individuals with Disabilities Education Improvement Act* (IDEIA), enmendó dicha legislación.

La *Ley Federal de Educación Especial* tiene, entre sus propósitos, asegurar que los niños con impedimentos reciban una educación pública, apropiada, gratuita, lo cual en inglés se conoce con las siglas "FAPE", y que atienda las necesidades especiales de cada estudiante. Además, busca garantizar que los derechos de los

---

[48] Conocida como la *Ley del Programa de Educación Especial.*
[49] 20 USC sec. 1400 *et seq.*

menores con impedimentos y sus padres sean protegidos, así como evaluar y asegurar la efectividad de los esfuerzos para educarlos. Ley Púb. Núm. 108-446, 20 USCA sec. 1400(d)(1), (2) y (4). Para ello, provee una serie de requisitos sustantivos y procesales. Véase, *Declet Ríos v. Depto. de Educación*, supra, pág. 777.

Mas adelante, la Asamblea Legislativa derogó la Ley Núm. 21, *supra*, y aprobó la Ley Núm. 51-1996, 18 LPRA sec. 1351 *et seq.*, conocida como *Ley de Servicios Educativos Integrales para Personas con Impedimentos*. Esta legislación ratifica el derecho de las personas con impedimentos a recibir una educación pública, gratuita y de acuerdo con sus necesidades, que le permita desarrollarse plenamente y convivir con dignidad en la comunidad de la que forman parte. A esos fines, se establecen las responsabilidades y funciones de todas las agencias que deben brindar servicios especializados y profesionales directos o relacionados con este sector de la población.[50] *Orraca López v. ELA*, supra, pág. 41. Dicho estatuto dispone, en su Artículo 3, sec. 1352, lo siguiente:

> El Gobierno de Puerto Rico se reafirma en su compromiso de promover el derecho constitucional de toda persona a una educación gratuita que propenda al "pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Para el logro de este propósito se trabajará conjuntamente con la familia, ya que el desarrollo integral de la persona con impedimentos debe estar enmarcado en su contexto familiar.
>
> Forma parte de esta política pública sobre las personas con impedimentos, hasta donde los recursos del Estado lo permitan, garantizar:
>
> (1) Una educación pública, gratuita y apropiada, en el ambiente menos restrictivo posible, especialmente diseñada de acuerdo a las necesidades individuales de las personas con impedimentos y con todos los servicios relacionados indispensables para su desarrollo, según se establezca en su plan individualizado de servicios, y lo más cerca posible de las demás personas sin impedimentos. Esto aplica tanto a las escuelas públicas del Departamento de Educación como a las Escuelas de la Comunidad bajo la administración del Instituto de Reforma Educativa.

---

[50] Véase, Exposición de Motivos de la *Ley de Servicios Educativos Integrales para Personas con Impedimentos*.

(2) Un proceso de identificación, localización, registro y una evaluación por un equipo multidisciplinario debidamente calificado de todas las personas con posibles impedimentos, dentro o fuera de la escuela, desde el nacimiento hasta los veintiún (21) años de edad inclusive.

(3) El diseño de un Programa Educativo Individualizado (PEI) que establezca las metas a largo y corto plazo, los servicios educativos y los servicios relacionados indispensables según lo determine el equipo multidisciplinario.

(4) La confidencialidad de toda información personal.

(5) Un sistema sencillo, rápido y justo de ventilación de querellas.

(6) La participación de los padres en la toma de decisiones en todo proceso relacionado con sus hijos.

[…]

Cónsono con lo anterior, la Ley Núm. 51-1996 y los reglamentos relacionados, responden a la obligación del Estado de cumplir con la *Ley Federal de Educación Especial*, supra, y sus reglamentos. [. . .]. [51] El estatuto federal requiere, *inter alia*, que los estados que se benefician de fondos federales del Departamento de Educación de los Estados Unidos (U.S. Department of Education) establezcan programas de educación especial pública, gratuita, apropiada y que atiendan las necesidades especiales de cada estudiante.[52] Véase, *Orraca López v. ELA*, supra, pág. 41. Puerto Rico se beneficia de dichos fondos desde los años 70 y, por tanto, está obligado a cumplir con esta. *Declet Ríos v. Depto. de Educación*, supra, págs. 775-776.

La educación pública, gratuita y apropiada es definida por la *Ley Federal de Educación Especial*, supra, como la educación especial y los servicios relacionados pagados por el erario y bajo la supervisión y dirección pública que cumplen las exigencias de la

---

[51] "[Individuals with Disabilities Education Act (IDEA)] leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, but imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer v. Weast*, 546 US 49, 52 (2005). Véase *Board of Ed. v. Rowley*, 458 US 176 (1982).

[52] Ley Púb. Núm. 108-446, de 3 de diciembre de 2004 (118 Stat. 2647), 20 U.S.C. sec.1401(31) ("The term "State" means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying.").

agencia educativa estatal. Estos incluyen educación preescolar, elemental o secundaria y se proveen conforme al programa educativo individualizado (PEI). 20 USC 1401 (9).

El PEI constituye el plan escrito de las necesidades educacionales del menor con impedimentos y la educación y servicios relacionados que se le proveerán, especialmente diseñados para cumplir con esas necesidades. 20 USC 1401 (14) y 1414 (d); *School Committee v. Dept. of Educ*, 471 US 359, 368 (1985). La educación pública, gratuita y apropiada está disponible para todos los niños con impedimentos que residan en los estados, entre las edades de tres (3) a veinte y un (21) años. 20 USC 1412 (1)(A).

En lo pertinente, la Ley Núm. 51-1996 define la *educación especial* como una "enseñanza pública gratuita especialmente para responder a las necesidades particulares de la persona con impedimentos, en el ambiente menos restrictivo". 18 LPRA sec. 1351 (7). La IDEA exige a toda agencia educativa que reciba asistencia al amparo de estas disposiciones, establecer y mantener procedimientos para asegurar que los niños con impedimentos y sus padres, tengan garantizadas salvaguardas procesales ("procedural safeguards"), con miras a lograr que se le provea una educación pública gratuita y apropiada. 20 USC 1415 (a). Los procedimientos requeridos por la antes mencionada sección deben incluir, entre otros, los siguientes: permitir que los padres puedan obtener una evaluación educativa independiente de su hijo con impedimento y la oportunidad a cualquier parte de presentar una querella. 20 USC 1415 (b)(1) y (b)(6); *School Committee v. Dept. of Educ,* supra, pág. 368.

Conforme a dicho mandato legislativo, el 20 de julio de 2020, el Departamento de Educación promulgó el *Manual de Procedimientos de Educación Especial* de 2020. Entre otras cosas, y en lo pertinente al PEI, este establece en su sección 7.1 lo siguiente:

Es el documento donde se establecen las necesidades académicas y funcionales del estudiante y cómo serán minimizadas a través de los servicios que el programa de educación especial ofrece con el propósito de garantizar que el estudiante reciba una educación pública, gratuita y apropiada, conocida como FAPE, por sus siglas en inglés"[53]. Además, el PEI recoge los acuerdos de aquellos servicios educativos, relacionados y suplementarios que el Departamento de Educación se compromete a ofrecerle al estudiante o la estudiante.[54]

Asimismo, es el documento oficial "[q]ue contiene servicios cobijados por legislación federal y estatal".[55] El manual dispone que, tanto la legislación federal como la estatal, garantizan el derecho del estudiante con discapacidad a ser educado en igualdad de condiciones en comparación con un estudiante sin discapacidad. En lo pertinente, la Ley IDEA establece que el Departamento de Educación tendrá disponibles diferentes ambientes educativos (alternativas de ubicación) apropiados donde implementar el PEI, para lograr que el estudiante con discapacidad se eduque y logre progresar en el currículo general. Sección 8.1 del *Manual de Procedimientos de Educación Especial*, pág. 80.

De este modo, le corresponde al Departamento de Educación realizar un análisis sobre las alternativas de ubicación apropiadas, conforme al PEI. La localización de alternativas de ubicación "es el proceso que realiza el funcionario del COMPU que representa al [Departamento de Educación] y a la ORE para identificar las escuelas donde se tiene disponible la alternativa de educación recomendada en el PEI".

Cuando el Departamento de Educación no tiene disponible la alternativa de educación recomendada en el PEI, este podrá identificar una escuela privada para comprar el servicio educativo, a costo público. La determinación de aprobar o rechazar una compra de servicios educativos le corresponde al Secretario Asociado de

---

[53] Sección 7.1 del *Manual de Procedimientos de Educación Especial*, pág. 65.
[54] *Íd.*
[55] *Íd.*

Educación Especial.[56] La alternativa de ubicación y localización recomendada deberá presentarse en la reunión con el Comité de Programación y Ubicación (COMPU). Tanto los padres como los miembros del COMPU pueden solicitar conocer las localizaciones presentadas, con el propósito de disipar dudas o inquietudes antes de su aceptación.[57]

De igual forma, los padres podrán presentar una propuesta que contempla la escuela privada de su predilección. Deberán entregar dicha propuesta al FDEE IV que estuviera trabajando la consulta. La propuesta será evaluada por el Secretario de Educación Especial, pero no constituirá un compromiso de parte del Departamento de Educación, ni asegura que se le otorgará una compra de servicio o que se aceptará la escuela privada propuesta.[58]

Ahora bien, la Ley Federal dispone que, en las instancias en que el Departamento de Educación no pueda ofrecerle los servicios educativos apropiados que el estudiante necesite en el sector público, este podrá comprar en el sector privado tales servicios educativos. 20 USC 1412 (A)(10)(B).

El Departamento de Educación deberá garantizar que la determinación de la alternativa de ubicación del estudiante con discapacidades sea tomada por el COMPU debidamente constituido, a base del PEI redactado y de conformidad con el principio de la alternativa menos restrictiva, conforme a lo dispuesto en la sección 300.114-120 del reglamento de la Ley IDEA. Ello incluye los casos en que se considera la ubicación del estudiante en una escuela o facilidad privada. Al analizar las posibles ubicaciones para implementar el PEI desarrollado, el COMPU deberá hacerlo mientras respeta las necesidades del estudiante, los recursos, las facilidades

---

[56] Sección 8.3 del *Manual de Procedimientos de Educación Especial*, págs. 90-91.
[57] Sección 8.4 del *Manual de Procedimientos de Educación Especial*, pág. 94.
[58] Sección 8.4 del *Manual de Procedimientos de Educación Especial*, pág. 96.

existentes y la viabilidad en cada alternativa de educar al estudiante junto a otros que no tienen discapacidades.[59]

De otra parte, cabe destacar que, como norma general, la Ley Federal no requiere que se pague por los costos de educación y otros servicios relacionados en una institución privada, si la agencia encargada puso a la disposición del estudiante una educación pública y apropiada, y los padres optaron por la alternativa privada. 20 USC 1412 (a)(10)(C)(i). La excepción a esta norma general es que procede el reembolso de estos gastos cuando un tribunal o juez administrativo determina que la agencia no cumplió con la obligación de proveer una educación pública, apropiada y gratuita, de manera oportuna ("in a timely manner")[60] y cuando la escuela privada en la cual este fue ubicado le resulta beneficiosa. 20 USC 1412 (a)(10)(C)(ii); 34 CFR 300.148 (c). En cuanto a los beneficios educacionales en la escuela privada, la Corte Suprema de los Estados Unidos dispuso lo siguiente:

> Accordingly, "when a public school system had defaulted on its obligations under the Act, a private school placement is 'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits.' "

*Florence County School Dist. Four v. Carter*, 510 U.S. 7, 11 (1993), citando a: *Board of Educ. v. Rowley*, 458 U.S. 176, 207, 73 L. Ed. 2d. 690, 102 S. Ct. 3034 (1982).

El reembolso requiere que el Estado pague aquellos gastos que debieron ser pagados y sostenidos, en primera instancia, si se hubiese preparado un PEI adecuado. *School Committee v. Dept. of Educ*, supra, págs. 370-371. El Alto Foro Federal dispuso que tal requerimiento surgió del historial legislativo, el cual dispone como sigue:

---

[59] Sección 8.5 del *Manual de Procedimientos de Educación Especial*, pág. 99.
[60] En Puerto Rico, el Artículo 4 de la Ley Núm. 51-1996, dispone que toda persona con impedimento tendrá derecho, entre otros: de "[s]er evaluadas y diagnosticadas con prontitud por un equipo multidisciplinario, que tome en consideración sus áreas de funcionamiento y necesidades, de modo que pueda recibir los servicios educativos y relacionados indispensables para su educación de acuerdo al programa educativo individualizado para el desarrollo óptimo de sus potencialidades". 18 LPRA sec. 1353(5).

> If a parent contends that he or she has been forced, at that parent's own expense, to seek private schooling for the child because an appropriate program does not exist within the local educational agency responsible for the child's education and the local educational agency disagrees, that disagreement and *the question of who remains financially responsible* is a matter to which the due process procedures established under [the predecessor to § 1415] appl[y].

S. Rep. No. 94–168, p. 32 (1975), U.S. Code Cong. & Admin. News 1975, pp. 1425, 1456; *School Committee v. Dept. of Education,* 471 U.S. 359, 371 (1985).

Con relación al reembolso de los gastos, la sección (iii) de la antes referida sección, denominada como "Limitation on reimbursement", enumera los siguientes casos en que el tribunal o el juez administrativo, según aplique, puede reducir o denegar el reembolso: (1) si, en la más reciente reunión para discutir el PEI, los padres no informaron a la agencia su inconformidad con el plan propuesto y su determinación de matricular al estudiante en una institución privada; (2) si, diez (10) días laborables antes de matricular al estudiante en una institución privada, los padres no notificaron por escrito a la agencia la información descrita en el párrafo (aa), es decir, si no informaron por escrito su inconformidad con la ubicación propuesta y su decisión de matricular al niño en una escuela privada; (3) si, con anterioridad a la remoción del estudiante de la escuela pública, la agencia notificó a los padres que el niño sería evaluado, pero los padres no permitieron que dicha evaluación se realizara y (4) si un tribunal determina que la actuación de los padres fue irrazonable. 20 U.S.C. sec. 1412(a)(10)(C)(iii).

Finalmente, la agencia también será responsable de sufragar los costos de educación de los niños con impedimentos en una institución privada, a los cuales se les provee educación especial y otros servicios relacionados. Ello, de conformidad con el PEI, en los supuestos siguientes: si la agencia consintió a que el niño fuese referido a una agencia privada; o si el estudiante con necesidades

especiales es ubicado por la propia agencia educativa en una institución privada. 20 USCA sec. 1412 (a)(10)(B)(i).

Según la jurisprudencia federal, el Estado cumple con su obligación de proveer una educación pública, gratuita y apropiada a un niño con impedimentos, cuando le provee "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. v. Rowley*, 458 US 176, 203 (1982). Es decir, el Estado cumple con su obligación, en la medida que le provee una educación personalizada con suficientes servicios relacionados (de apoyo), para permitir que el niño se beneficie académicamente de dicha educación. En el caso de *Rowley*, supra, el Alto Foro federal añade, en lo pertinente, que:

> Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, **the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade**. (Negrillas suplidas).

*Íd.*

Ahora bien, en *Forest Grove School Dist. v. T.A.,* 557 U.S. 230 (2009), el Tribunal Supremo federal dispuso que, cuando una agencia educativa omite preparar un PEI para un estudiante de educación especial, ello constituye una denegatoria de su derecho a una educación pública, gratuita y apropiada. Sobre estos extremos, en *Forest Grove School Dist. v. T.A.,* supra*,* el Alto Foro federal estableció expresamente lo siguiente:

> Moreover, when a child requires special-education services, **a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide and adequate IEP**. (Negrillas suplidas).

*Forest Grove School Dist. v. T.A.,* supra, págs. 289-239.

Ahora bien, en lo pertinente, en *Schaffer v. Weast,* 546 U.S. 49, 57-59 (2005), el Alto Foro federal advirtió que los distritos escolares debían cumplir cabalmente con sus responsabilidades, como convocar reuniones de COMPU y diseñar un PEI apropiado. Asimismo, consideró que un distrito escolar que incumple esas obligaciones puede perder su argumento, si la parte reclamante demuestra que la falta de cumplimiento le causó una privación sustantiva de FAPE. En esa ocasión, se estableció lo siguiente:

> School districts would be well-advised to include parents in the IEP process, keep thorough records and provide full explanations of their educational proposals. A district that fails in these duties risks losing even if the parents bear the burden of proof.

*Schaffer v. Weast,* supra, pág. 59.

## C

El Reglamento Núm. 9196 de 9 de julio de 2020, conocido como el *Reglamento de Compras de Servicio en Escuelas Privadas*, dispone en su artículo 1 que, cuando el Departamento de Educación reconoce que no cuenta con la ubicación apropiada para el estudiante con impedimentos, deberá pagar los gastos educativos y de servicios relacionados en una institución privada. Ello, sin costo para el padre, madre o encargado.[61]

En lo referente a las modalidades de compra de servicios, el Artículo 6.1 del Reglamento Núm. 9196 establece que, en las instancias en que un estudiante con discapacidad no pudiese ser adecuadamente ubicado y servido en el sistema de educación pública, este podrá, con autorización del Secretario Asociado de Educación Especial (SAEE), ser ubicado en una institución privada contratada por la agencia. Los estudiantes ubicados por la agencia en instituciones o escuelas privadas contarán con los mismos derechos que aquellos que reciben servicios en el sistema público.

---

[61] *Véase,* además, Artículo 5.1 del Reglamento 9196.

Artículo 6.1 del Reglamento Núm. 9196. De otra parte, el Artículo 6.2 del aludido Reglamento dispone, en lo pertinente que, tanto la Ley IDEA como la jurisprudencia, reconocen el derecho de los padres a recibir un reembolso por concepto de los gastos educativos y relacionados en que incurrieron para el beneficio de sus hijos, cuando: 1) la agencia no ofrece una educación pública, gratuita y apropiada de manera oportuna antes de la ubicación en la escuela privada; 2) si la ubicación privada del estudiante es apropiada y 3) si se cumplen los requisitos de equidad.

En lo referente al pago directo por parte del Departamento de Educación a instituciones privadas que no tienen contrato con la agencia, el Artículo 6.3 del Reglamento Núm. 9196 dispone que:

> En los casos en que, de ordinario, procedería un reembolso de los gastos incurridos por los padres para sufragar servicios educativos y relacionados, los padres podrán solicitar a la Agencia el pago directo a las instituciones privadas que proveen dichos servicios, aun ante la inexistencia de vínculo contractual entre la Agencia y la institución en cuestión. Procederá dicha solicitud al quedar demostrado que el padre no posee la capacidad económica de adelantar el pago en cuestión y que, por ende, el rembolso no sería una alternativa real ni viable.

En los casos en que la agencia educativa estatal incumple con su obligación de proveer FAPE a un estudiante de educación especial, los tribunales podrán conceder aquellos remedios que entiendan apropiados. 20 USCA 1415(i) 1415 (i) (2) (C) (iii).

De otra parte, la definición de servicios de transición en la esfera federal que provee 20 U.S.C. sec. 1401(34) y 34 C.F.R. sec. 300.43 provee lo siguiente:

> (34) Transition services
>
> The term transition services means a coordinated set of activities for a child with a disability that-
>
> (A) Is designed to be within a results oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post school activities, including post secondary education, vocational education integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation.

(B) Is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and

(C) Includes instruction, related services, community experiences, the development of employment and other post-school adult living obectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

En la esfera estatal, el Artículo 2, inciso (23) de la Ley Núm. 51-1996, define transición como sigue:

Proceso para facilitar a la persona con impedimentos su adaptación o integración a un nuevo ambiente, de las etapas de intervención temprana a la preescolar; a la escolar; al mundo del trabajo; a la vida independiente; o a la educación *post* secundaria.

A los fines de atender la complejidad del proceso de transición de la vida escolar al mundo del trabajo, a la educación postsecundaria y a la vida independiente, la reglamentación federal que implementa la Ley IDEA reconoce que los servicios de transición deben incluir varios componentes. Estos son los siguientes: servicios educativos, servicios relacionados, experiencias en la comunidad, el desarrollo de objetivos para el mundo laboral y la vida adulta postescolar y, además, adquirir destrezas del diario vivir y el efectuarle al estudiante una evaluación vocacional funcional. 34 C.F.R. sec. 300.43 (a)(2i, ii, iii, iv, v). En ese contexto, los servicios de transición podrían incluir servicios de educación especial (provistos como educación especialmente diseñada) y servicios relacionados (para asistir al estudiante para beneficiarse de una educación especial). 34 C.F.R. 300,43(b).[62] A su vez, los servicios de transición deben estar basados en las necesidades del estudiante y tomar en consideración sus capacidades, intereses y preferencias. 34 C.F.R. sec. 300.43 (a) (2).

---

[62] Transition services for children with disabilities may be special education, if provide as specially designed instruction, or a related service, if required to assist a child with disability to benefit from special education. 34 CFR 300.43(b).

A tales efectos, la Sección 15.4 del *Manual de Procedimientos de Educación Especial* de 2020, dispone, en lo pertinente, que:

> El proceso de transición de la etapa escolar a la etapa adulta consta de una serie de actividades dirigidas a que el estudiante y su familia se preparen para la salida de la escuela y para las responsabilidades que conlleva la vida adulta. Durante el proceso, el estudiante participará de diversidad de actividades, orientaciones y experiencias dirigidas a la toma de decisiones sobre su futuro en cuanto a estudios postsecundarios, adiestramiento para un empleo, experiencias de empleo, vida en comunidad, y de ser necesario, destrezas de ayuda propia. **El proceso de transición y sus actividades busca identificar las capacidades académicas y funcionales que el estudiante tiene y como lo acercan a sus metas postsecundarias con el propósito de desarrollar un programa de servicios que cierre la brecha entre ellos**. (Negrillas suplidas).

### C

La desestimación es un pronunciamiento judicial que resuelve el pleito de forma desfavorable para el demandante. *SLG Sierra v. Rodríguez*, 163 DPR 738, 745 (2005). En el ámbito civil, la Regla 39.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2, codifica la desestimación de los pleitos. Esta, permite la desestimación de pleitos a iniciativa del Tribunal o a solicitud de la parte demandada, en casos en que se incumpla con la Regla o cualquier orden del Tribunal; cuando se deja de proseguir el caso; **o cuando no se presenta prueba que justifique la concesión de un remedio**. Regla 39.2 de Procedimiento Civil, *supra*.

Así, la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2(c), codifica la moción de desestimación, mejor conocida como *non suit*. Mediante esta, una parte demandada puede presentar una moción de desestimación cuando la parte demandante no presenta prueba que justifique la concesión de un remedio. Esta regla dispone como sigue:

> [...]

> (c) Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada "sin lugar", podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno. El tribunal podrá

entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal lo disponga de otro modo en su orden de desestimación, una desestimación bajo esta Regla 39.2 y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos.

Véase, además, *Mitsubishi Motor v. Lunor y otros*, 212 DPR 807, 820-821 (2023).

En *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 916 (2011), el Tribunal Supremo delineó los factores que deben tomarse en cuenta al adjudicar una solicitud de desestimación, al amparo de esta regla. Estos son los siguientes:

En una moción al amparo de la Regla 39.2(c), conocida como una moción contra la prueba o *non-suit,* el tribunal está autorizado, luego de la presentación de prueba por parte del demandante, a aquilatar la misma y a formular su apreciación de los hechos, según la credibilidad que le haya merecido la evidencia. Pero esa facultad debe ejercitarse después de un escrutinio sereno y cuidadoso de la prueba. En caso de duda, debe requerirse al demandado que presente su caso. En ese momento, le corresponde al tribunal determinar si la prueba presentada por la parte demandante es suficiente por sí misma para satisfacer los requisitos de su particular causa de acción.

[…]. Además, dada la gravedad de una desestimación de la causa de acción, los tribunales deben ser cuidadosos al atender una moción al amparo de la Regla 39.2(c) pues conlleva el final de la reclamación de un demandante y de su día en corte. Se trata de una decisión que descansa en la sana discreción del tribunal. (Nota al calce omitidas).

Por último, reiteramos que el Alto Foro ha sido enfático en que una moción de "*non suit*" únicamente procede cuando el tribunal está plenamente convencido de que el demandante no tiene oportunidad de prevalecer. *Lebrón v. Díaz*, 166 DPR 89, 94-95 (2005). En fin, es un principio claro que se trata de un poder discrecional que debe ejercerse de forma juiciosa y apropiada.

**III**

Mediante los señalamientos de error formulados, el recurrente plantea que el foro administrativo erró al adoptar determinaciones, sin base en el récord o prueba admisible. Asimismo, que incidió al desestimar la acción aplicando un estándar de adecuacidad que

resultó mayor al reconocido jurisprudencialmente en los casos *Board of Educ. v. Rowley*, supra, y *Florence County School Dist. Four v. Carter*, supra, y al declarar prematura la controversia sobre ubicación privada, por ausencia de un plan aprobado en COMPU. En fin, adujo que la agencia recurrida erró en su ejercicio de apreciación de la prueba desfilada, mostrando parcialidad y error manifiesto. Tras analizar de manera conjunta los señalamientos de error esbozados en el presente recurso, concluimos que la agencia recurrida erró al desestimar la *Querella* de epígrafe por el fundamento de insuficiencia de prueba. Veamos.

Como norma general, las Reglas de Procedimiento Civil, 32 LPRA Ap. V, no son aplicables a los procesos adjudicativos llevados a cabo en los foros administrativos. Véase, *Pérez v. VPH Motor Corp.*, 152 DPR 475, 484 (2000); *López Vives v. Policía de P.R.*, 118 DPR 219, 231 (1987). No obstante, jurisprudencialmente se ha autorizado la aplicación de ciertas reglas a los procedimientos administrativos. Ello, sujeto a que sean compatibles con la naturaleza del trámite, abonen a propiciar una solución justa, rápida y económica del caso, y lo autorice el funcionario adjudicativo a cargo. *Flores Concepción v. Taíno Motors*, 168 DPR 504, 518-519 (2006); *Hosp. Dr. Domínguez v. Ryder*, 161 DPR 341, 346 (2004).

Con lo anterior en mente, en nuestra exposición del derecho aplicable, discutimos lo pertinente a las mociones de desestimación o *non suit*, que se encuentran codificadas en la Regla 39.2(c) de Procedimiento Civil, *supra*. Este Foro llevó a cabo el mencionado ejercicio con carácter supletorio y en consideración a que el Reglamento Núm. 9168 de 26 de febrero de 2020,[63] aplicable a

---

[63] Conocido como *Reglamento del procedimiento para la resolución de querellas administrativas de educación especial y sobre la otorgación de honorarios de abogados.*

procedimientos administrativos como el de epígrafe, no contempla expresamente esta herramienta procesal.

Aclarado lo anterior, resulta de suma importancia resaltar que la disposición del presente recurso ocurrió precisamente en función de la adjudicación de una moción de desestimación o *non suit.* Nótese que esta fue presentada por la parte recurrida -y adjudicada por el foro administrativo- luego de que el recurrente culminara su desfile de prueba, pero *antes* del señalamiento de continuación de vista administrativa, pautado para el 12 de junio de 2025.

En lo pertinente, surge del dictamen recurrido que, durante la continuación de vista, la parte recurrida presentaría su prueba testifical y documental. Sin embargo, la jueza administrativa a cargo también consignó que la parte recurrida había anticipado su intención de presentar una moción de *non suit* antes de la continuación de vista, lo cual hizo el 11 de junio de 2025. Debido a lo anterior, la agencia dejó sin efecto el señalamiento y, mediante el dictamen recurrido, adjudicó la moción, declarándola *Ha Lugar.* En consecuencia, la parte recurrida <u>no llegó a presentar su prueba</u>.

Así las cosas, en el recurso de epígrafe, el recurrente señaló que disponer de la *Querella* de epígrafe mediante una moción de *non suit* fue un proceder errado por parte del foro administrativo. Argumentó que la única alternativa viable para que la jueza administrativa pudiese tener los criterios suficientes para determinar la razonabilidad de los costos de la propuesta de S.E.R.A., es que ordenemos la continuidad del caso. Razonó que, solo así, la agencia recurrida estaría en posición de pasar juicio sobre la adecuacidad de la propuesta de S.E.R.A., analizada en contraposición a la propuesta de Salud Integral, que es el contratista externo del Departamento de Educación, para estos fines. Tiene razón el recurrente.

Como discutiéramos en la exposición del derecho aplicable, el *non suit* únicamente procede cuando el adjudicador está plenamente convencido de que el querellante no tiene oportunidad de prevalecer. Es decir, que no tiene derecho a la concesión de remedio alguno. En consideración a ello, y luego de analizar los escritos presentados por las partes, la prueba documental y la TPO, consideramos que el presente caso no satisface los criterios dispuestos en la Regla 39.2(c), *supra,* para su desestimación mediante *non suit.*

En esencia, en la *Resolución Final* recurrida, la agencia concluyó que la propuesta de S.E.R.A. no satisfizo el requisito de adecuacidad. Ello, pues promueve un modelo que todavía se encuentra en diseño y sin garantías de ejecución inmediata, lo que podría generar retrasos sustanciales en la prestación de servicios esenciales al estudiante.[64] Asimismo, que los costos de dicha propuesta son excesivamente elevados y que el recurrente no presentó evidencia alguna de los recursos humanos que pretende utilizar, de la preparación de estos o su contrato con S.E.R.A.[65]

De forma cónsona, en el *Escrito en Cumplimiento de Resolución* presentado ante nos, la parte recurrida expuso que el recurrente enmarcó su argumentación en un presunto patrón de incumplimiento por parte del Departamento de Educación, así como en una propuesta alterna de un contratista de la agencia, que no fue discutida en la vista en su fondo, pero que guarda similitud con la propuesta de S.E.R.A. Sin embargo, la parte recurrida razonó que el asunto ante nuestra consideración no es su presunto incumplimiento, sino la viabilidad de la ubicación propuesta por el recurrente.

Luego de evaluar la totalidad del expediente administrativo, consideramos que el recurrente cumplió con la carga probatoria

---

[64] *Resolución Final* recurrida, pág. 19.
[65] *Íd.*

mínima requerida para superar el cedazo de una moción de *non suit* y permitir, durante una continuación de vista, que la parte recurrida también desfile su prueba. Enfatizamos que no procede conceder este tipo de desestimación, a menos que quede claro que la parte promovente carece de derecho a la concesión de remedio alguno.

Luego de evaluar la TPO, estamos convencidos de que la doctora Santiago, en su calidad de gerente de operaciones de S.E.R.A. y directora del proyecto objeto de controversia, testificó sobre los criterios tomados en cuenta para elaborar la propuesta concreta, ajustada a las necesidades del recurrente.[66] También, dio detalles sobre el plan de acción trazado para ponerla en vigor. Asimismo, proveyó información sobre los costos que acarrearía su implementación. En cuanto a los recursos humanos disponibles, también surge de la prueba la disponibilidad de una serie de profesionales, entre los que se destacan Rafael Ramírez Santiago, fotógrafo profesional que imparte capacitación en S.E.R.A.

Así las cosas, coincidimos con lo argumentado por el recurrente en el recurso de epígrafe, a los fines de que procede permitir que la parte recurrida desfile su prueba. Ello, pues evaluar la propuesta de S.E.R.A., en contraposición a la propuesta de Salud Integral, abonaría a un análisis más completo y balanceado basado en el criterio aplicable de adecuacidad. En consecuencia, procede devolver el caso ante la consideración de la agencia recurrida, para la continuación de los procesos.

### IV

Por los fundamentos anteriormente expuestos, los cuales se hacen formar parte de esta *Sentencia*, se revoca la *Resolución Final* recurrida. En consecuencia, se devuelve el caso ante la consideración de la agencia recurrida, para la continuación de los

---

[66] *Véase* págs. 162- 248 de la TPO.

procedimientos de manera cónsona con los pronunciamientos esbozados en la presente *Sentencia*.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones